2021 MAR 15 P 4: 45

| | |
|---|---|
| UNITED STATE DISTRICT COUT; | |
| DISTRICT OF NEW JERSEY; NEWARK LOCATION | |
| | |
| ROBERT C. DALTON, an individual | Civil Complaint |
| *The Plaintiff* | |
| v. | |
| | March 15, 2021 |
| Saint Barnabas Medical Center, a corporate entity, | |
| RWJBarnabas Health, a corporate entity, | |
| NICOLE CENTRELLA, an individual, and | |
| Dr. Jane Doe, Individual. | |
| *The Defendants* | |

**Civil Action:  Civil Lawsuit for Civil Rights Violation involving Discrimination on the Basis of the Plaintiff's Disability by the DEFENDANTS and the DEFENDANTS Denying the Plaintiff his Civil Rights regarding The Plaintiff's Preferred Method of Effective Communication for the Plaintiff's Disability Under the Americans with Disabilities Act (ADA), as amended, and the Rehabilitation Act of 1973, as amended, .  The Plaintiff Seeks Damages totaling $25,000,000.00 plus legal fees and other related compensation for these civil rights violations and related harm and injury.**

### i. Preface

1. The TBI-disabled Plaintiff requests that the Court note that the Plaintiff is medically document with afflictions having several long-term and permanent deficiencies. These deficiencies are due to a moderate to severe traumatic brain injury (TBI) that occurred in 2012, and then these deficiencies were exacerbated with two subsequent concussive events: one in 2017 and another in 2019. The TBI-disabled Plaintiff has expression difficulties, various executive function deficiencies, photophobias related to light wavelength and intensity photophobias, phonophobia, depressed energy levels, and other. The TBI-disabled Plaintiff is documented with aphasia and tangential, circumstantial (circumstantial meaning "*of description containing full details*'), and verbose communications.

2. The Plaintiff humbly request that the Court consider the Plaintiff's disabilities during the proceeding of this civil action. Often the Plaintiff needs more time complete tasks and has difficulty expression himself.

### 1. Parties Involved

3. Plaintiff:   Robert C. Dalton, an individual
24 Maryland Rd
Little Egg Harbor Twp., NJ 08087
Phone: 609-879-1797
Email: rca.dalton@gmail.com
[referred to herein as the "Plaintiff" or "TBI-Disabled Plaintiff"]

4. Defendant 1:   Saint Barnabas Medical Center, a corporate entity,
Stephen P. Zieniewicz, President and CEO
94 Old Short Hills Rd.
Livingston, NJ 07039
Phone: 973-322-5000
www.rwjbh.org/saint-barnabas-medical-center/contact-us/
[referred to herein also as "corporate defendant 1"]

|    |                |                                                          |
|----|----------------|----------------------------------------------------------|
|    | 5. Defendant 2: | RWJBarnabas Health, a corporate entity                  |
|    |                | Barry H. Ostrowsky, President and CEO                    |
|    |                | 95 Old Short Hill Rd.                                    |
|    |                | West Orange, NJ 07052                                    |
| 65 |                | Phone: 888-724-7123                                      |
|    |                | www.rwjbh.org/contact-rwjbarnabas-health/                |
|    |                | [referred to herein also as "corporate defendant 2"]     |
|    | 6. Defendant 3: | Nicole Centrella, an individual                         |
| 70 |                | 94 Old Short Hills Rd.                                   |
|    |                | Livingston, NJ 07039                                     |
|    |                | Phone: 973-322-500                                       |
|    |                | www.rwjbh.org/saint-barnabas-medical-center/contact-us/  |
|    |                | [referred to herein also as "individual 1"]              |
| 75 |                |                                                          |
|    | 7. Defendant 4: | Dr. Jane Doe, an individual                             |
|    |                | *(Dr. Jane Doe was the Head of the Emergency Room (ER)* |
|    |                | *at the time of my visit to the ER)*                    |
|    |                | 94 Old Short Hills Rd.                                   |
| 80 |                | Livingston, NJ 07039                                     |
|    |                | Phone: 973-322-500                                       |
|    |                | www.rwjbh.org/saint-barnabas-medical-center/contact-us/  |
|    |                | [referred to herein also as "individual 2"]              |

85   8. Collectively, corporate defendant 1, corporate defendant 2, individual 1, and

individual 2 are referred to herein as the "DEFENDANTS".


## 2. Basic for Jurisdiction

90   9. The basis for Jurisdiction is a Federal Question pertaining to the Americans with

Disabilities Act (ADA), as amended.  More specifically, Title III of the ADA, as amended

pertaining to the effective communication.  And, Section 504 of the Rehabilitation Act of 1973,

as amended, regarding effective communication.

95  10. Moreover, the Plaintiff's civil rights of due process and equal protection under the law under the 14th Amendment and due process under the 5th Amendment were violated by the Defendants.

11. Furthermore, the basis for Jurisdiction 29 USC §794 Non-discrimination under Federal Grant and programs. More specifically, corporate entity 1 and corporate entity 2 is subject to 29 U.S. Code 794 (b)(3)(A)(ii) since these state corporate entities are principally
100  engaged in the business of health care.

12. The United States District Court: District of New Jersey; Newark location has subjected matter, specific and personal jurisdiction in this matter. This civil action arises out of action in Livingston, New Jersey.

13. Moreover, the damage exceeds the about of $75,000.00

105

### 3. Matters of Law

14. The *pro se* TBI-disabled Plaintiff refers to the document on Effective Communication from the Disability Rights Section of the Civil Rights Division of the United States Department of Justice Document that is found in Appendix A for references to the matters of law.

110  15. The Plaintiff believes the matters of law pertain to Titles II and III of the Americans with Disability Act (ADA), as amend, and this law is believed to be 42 U.S. Code; Chapter 126 Equal Opportunity for Individual with Disabilities. More, specifically to law and regulations under this ADA for "effective communication" and "communication" , Furthermore, the TBI-disabled Plaintiff believes that the matters of law pertain to The Rehabilitation Act of 1973, as
115  amended, and this law is believed to be 29 U.S. Code Chapter 16 – Vocational Rehabilitation

and Other Rehabilitation Service inclusive of 29 USC 794, Nondiscrimination under Federal grants and program and other related laws and regulation regarding "effective communication" and "communication" under this Chapter.

### 4. Statement of Claim

120    16. Corporate defendant 1 is part of corporate defendant 2's healthcare system.

17. Defendant 3 is believed to be the nurse practitioner who provided medical attention to the Plaintiff and who denied the TBI-disabled plaintiff's requested preferred method of effective communication. Thus, defendant 3 violated the civil rights of the TBI-disabled plaintiff.

125    18. Defendant 4 is director/head doctor of the ER who also denied the TBI-disabled Plaintiff's repeated request for his preferred method of effective communication and who put the non-violent, non-aggressive Plaintiff under armed guard in a private room. (Prior to being under armed guard, the Plaintiff made multiple requested to defendants 3 and 4 to change location for examination and waiting inside the ER due to his phonophobia. The TBI-disabled

130    Plaintiff's requests to be removed to an area that was much more quieter compared to the ER were refused multiple times by defendant 3 and 4. Moreover, the local noise in the ER was exacerbated the Plaintiff's decline in executive function on top of the decline in the Plaintiff's executive functions due the accident; The emergency room environment had too much noise and distractions for the plaintiff causing more confusion, forgetfulness, and decline in executive

135    functions in the TBI-disabled Plaintiff, and then the Plaintiff's confusion, forgetfulness and decline in executive functions were being worsened by the agitation being cause the rapid,

illogical banter from defendants 3 and 4 as they refused the Plaintiff's requests for accommodation and his preferred method of communication.)

19. The TBI-disabled Plaintiff was disabled with a traumatic brain injury and made all the staff that he encountered at Saint Barnabas Medical Center aware that he was disabled with complications due to a moderate to severe traumatic brain injury. The DEFENDANTS operation was a place of public accommodation. The TBI-disable Plaintiff was denied his public accommodation of his preferred method of effective communication due to his disability [The Court should note that Saint Barnabas Medical Center regularly accommodates people with other disabilities as even stated on their website; However, Saint Barnabas Medical Center did not accommodate preferred effective communication for the Plaintiff's disability, a traumatic brain injury].

20. The TBI-disabled Plaintiff has a medically established disability. The Plaintiff's disability was known to the Defendants. The Plaintiff requested accommodation for his disability so the Plaintiff and benefit of a service with equal opportunity as people without the Plaintiff's disability. The DEFENDANTS repeatedly denied the TBI-disables Plaintiff's requested accommodation for his disability. The DEFENDANTS discriminated against the Plaintiff on the Basis of the Plaintiff's disability

21. The TBI-Plaintiff has a disability. The Plaintiff's disability has a communication and expression disability that affects the Plaintiff's executive functions. These aspects of the Plaintiff's disability were made know to the DEFENDANTS. The Plaintiff's requested accommodations for his disability. The Plaintiff repeatedly requested that the DEFENDEDANTS provide the Plaintiff's preferred method of effective communication for his disability and the

current situation. The DEFENDANTS repeatedly denied the Plaintiff's requests for his preferred

160   method of effective communication. The DEFENDANTS refused to provide the Plaintiff with an

alternative to his requested preferred method of communication that was as effective in

communication for the situation at hand as the Plaintiff requested. The DEFENDENTS refused

and failed to provide the Plaintiff with an explanation regarding how and why the Plaintiff's

repeatedly requested preferred method for effective communication for the situation was an

165   undue burden financially for the DEFENDANTS. The DEFENDENTS refused and failed to provide

the Plaintiff with an explanation regarding how and why the Plaintiff's repeatedly requested

preferred method for effective communication for the situation was an undue burden

administratively for the DEFENDANTS. The DEFENDANTS refused and failed to provide the

Plaintiff with an explanation on how and why the Plaintiff's requested preferred method of

170   effective communication would fundamentally alter the nature of the DEFENDANTS program

and/or activities at hand.

22. Furthermore, with deliberate indifference, the DEFENDANTS refused and failed to

provide the Plaintiff with a written statement by an individual with the  proper authority to

provide the Plaintiff explaining  how and why the Plaintiff's requested preferred method of

175   effective communication would fundamentally alter the a nature of the program and or activity,

how and why this request would be a undue financial burden upon the DEFENDANTS, and/or

how and why this request would be and undue administrative burden upon the DEFENDENTS.

Furthermore, with deliberate indifference, the DEFENDANTS refused and failed to provide the

Plaintiff with a written statement by an individual with the proper authority to provide such a

180   written statement that states and explains to the Plaintiff an alternative method of effective

communication that would be as effective as the Plaintiff's requested method of effective communication for his disability in the current situation and that would be as effective as would be for individuals without the Plaintiff's disability and aspects of his disability in the current situation. Furthermore, no written statement on this matter was provided by the DEFENDANTS.

23. During the afternoon on March 14, 2021, the TBI-disabled Plaintiff was traveling to the West Orange, NJ campus to the Kessler Institute for Rehabilitation for a scheduled session for ongoing research in brain injuries by Kessler when the TBI-disabled Plaintiff was in a car accident. The other drive fails to stop her car in time, and subsequently the other driver's car hit the Plaintiff's car from behind. See Exhibit 1 for details of car accident.

24. Emergency and traffic safety personnel arrived on the scene.

25. The TBI-disabled plaintiff was offered an ambulance to a hospital. Despite being a bit confused and disorientated, the TBI-Plaintiff elected to drive his car to the nearest hospital with the aid of GPS on the phone. The Plaintiff had a difficult decision to make, because of his dire financial position that remains to the day of submitting this complaint. Had the Plaintiff taken an ambulance to hospital, the Plaintiff could not afford to get his car out of the impoundment, pay for towing, and/or pay for a taxi to take him 100 miles to the Plaintiff home. The Plaintiff's car was drivable, and the authorities onsite at the accident allowed the Plaintiff to drive to the hospital.

26. The Plaintiff reported to the authorities on the scene of the accident information about the Plaintiff's back pain in the up and down the spine and a bit of disorientation as a result of this accident.

27. The Plaintiff arrived at the ER of Saint Barnabas Medical Center in Livingston, NJ. During the admittance, the Plaintiff disclosed to the admitting staff that he was disabled from a moderate to severe TBI in 2012, and the current accident was causing him much pain in his back at the mid-spine with some discomfort in his neck as well as being a bit out of sorts mentally with from the impact. After being admitted and sent to the waiting area, the Plaintiff was called into the ER for examination and any medical treatment.

28. The TBI-disabled Plaintiff was seated alone in a small private area that was surrounded by curtains where he was out of view from others and others were out of view from him. The noise and distractions began to bother and agitate the plaintiff making the Plaintiff a bit confused. A healthcare provider came into the area to examine the Plaintiff.

29. The Plaintiff was initially examined by defendant 3.

30. The Plaintiff became confused by the questioning of the examiner and the examiner's answers when the Plaintiff complained about the large amount of pain in his mid-back and neck discomfort. The Plaintiff explained to defendant 3 that his back hurt where previous facture damage to his transverse, spinous, and other processes of his spine after his TBI-disabling accident where he was thrown from his car in 2012. Defendant 3 refuse to do any imaging. The Plaintiff repeatedly complained to defendant 3 as he became more confused. Next, the Plaintiff requested that defendant 3 provide the TBI-disable plaintiff his preferred method of communication that was to record the verbal information that defendant 3 was providing for treating the Plaintiff and why. [The plaintiff had a good understanding of HIPPA requirements and his rights as well as others right under HIPPA. Also, the Plaintiff understood his civil rights under the ADA, as amended, and the Rehabilitation Act of 1973, as amended

225   especially after being disabled by a traumatic brain injury as well as State and Federal law for

recording conversations. The plaintiff had been employed by a healthcare insurance company,

medical supply companies and pharmaceutical consulting and service company as a

pharmaceutical sample representative]

      31. Defendant 3 repeated refused to provide the Plaintiff with his preferred method of

230   effective communications.  The noise from the ER area  and the rapid, illogical banter from

Defendant 3 was making the Plaintiff more confused as the TBI-disabled Plaintiff  was becoming

aware that his executive functions were declining, and the TBI-disabled Plaintiff was aware that

he was starting to have aphasia and more confusion.  The Plaintiff continue to state his

concerns and requests for his preferred method of communication that to audio record the

235   defendant 3 using his smart phone. The Plaintiff was having much difficulty understanding,

reasoning, and remembering  what Defendant 3 was informing him regarding the state of his

injuries; the Plaintiff was having trouble understanding logic of Defendant 3 in the face of his

mid-back and neck pain and stiffness.

      32. The Plaintiff had great concerns about possible damage to his neck's nervous system

240   and his mid-back after this recent concussive impact; the Plaintiff was keenly aware that

concussive events post an initial traumatic brain injury typically cause great deficiencies in

executive functions, energy, and mobility – this is well-note by the TBI-disabled plaintiff from

expert healthcare providers who have a specialty in brain injuries.

      33. Defendant 3 continue to refuse the Plaintiff's requested preferred method of

245   effective communication for the situation at hand and his request of imaging of his neck and

mid-back because of the pain [the neck is where a nerve system is located]. At this point, the

noise in the ER was overwhelming the Plaintiff, and this noise continued to agitate the Plaintiff and causing his executive function to decline.

34. Next, the Plaintiff asked defendant 3 repeated to be move to a quieter location, for his preferred method of effective communication, and for imaging of his neck and mid-back, but defendant 3 continued to refuse all of the Plaintiff's requests. Next, the Plaintiff requested to speak with a doctor because Defendant 3 was a nurse practitioner. Defendant 3 went and got a superior who was a doctor and the present head of the ER, defendant 4, to talk to the Plaintiff.

35. Once again, the TBI-disable Plaintiff repeatedly pleaded with defendants 3 and 4, as a gentleman, to accommodate the plaintiff's requests. These requests were 1) to be move to a quieter location so the ER noise would not continue to agitate the plaintiff and continue the decline in his executive function including confusion, aphasia, holding thoughts, etc., 2) to allow the TBI-disabled plaintiff to use his phone to record the audio of the medical information and answers being spoken by defendants 3 and 4 to the Plaintiff's questions about his medical condition, his pain, etc,; the plaintiff requested this preferred method of communication of recording because of the decline in his executive functions, and 3) imaging of his mid-back and neck. Defendant 4 said that she would find an accommodation for the noise and provide me imaging of my lower back and neck. Then, again, the Plaintiff asked for imaging where my pain actually was, my mid-back.

36. Again, the Plaintiff asked for the area where my pain was radiating from in my mid-back to be imaged, and Defendant 4 said, "ok". Next, defendant 4 left the area to find a place

for Plaintiff without noise. Defendant 3 told the Plaintiff that he was going to have his mid-back x-rayed. Next, the Plaintiff left this area to get x-rays.

270   37. When the Plaintiff got to the x-ray room, the Plaintiff asked the x-ray technician who was operating the machine, if there was an order for x-rays of his mid-back. The x-ray technician said, "no".

38. After the x-rays were completed, the Plaintiff was taken to a private examination room in the ER having solid walls all around with a door to the hallway. Next, the defendant 4
275   and an armed security guard came in the room with the armed guard's hand resting on his holstered gun. Again, the Plaintiff made requests that were not yet provided to the Plaintiff: a) the Plaintiff formed defendant 4 that he needed to record the medical information that defendant 4 was telling the Plaintiff and the answers to Plaintiff's questions because the Plaintiff did not understand why defendant 4 was providing him with imaging of his lower back,
280   but not where the Plaintiff had much pain in his mid-back, the place that was previously injured in many areas. Furthermore, at this time, the Plaintiff's executive functions were declining again from the anxiety of having an arm guard with the guard's hand resting on the guard's holster gun where the handle to the guard's pistol was (referred to herein as individual 5).

Furthermore, the TBI-disabled Plaintiff was still confused about the medical information
285   that was being provide to him by defendant 4. Once again, the Plaintiff asked defendant 4 for imaging of his mid-back where the Plaintiff's pain was. The Plaintiff received a "weird answer" without an explanation from Defendant 4, then she left.

39. Defendant 4's weird answer about imaging was that "the artificial intelligence software told her only to image Plaintiff's lower back". No further explanation was provided to

290  the Plaintiff. The TBI-disabled Plaintiff remained in the room with individual 5, the armed security guy. The Plaintiff later found out that the cost for the x-ray of his mid-back area is estimated, based upon the cost the x-ray of my lower back, to be $59 (fifty-nine dollars), This miniscule amount is besides that fact that the Plaintiff was already in the x-ray room and on the table for the x-ray machine.

295  40. After defendant 4 left this private room, the TBI-disabled Plaintiff was alone being very anxious and nervous with individual 5 with his arm resting upon his holstered guy. The TBI-disabled Plaintiff told individual 5 that the Plaintiff had not been here to cause trouble, and the Plaintiff has no plans to cause trouble. The Plaintiff told individual 5 that the Plaintiff would resolve this issue after the Plaintiff leaves the hospital facility by legal means. Soon after

300  speaking this to individual 5, the Plaintiff's emotional dysregulation became exacerbated from this auto accident, and the Plaintiff began to get emotional, crying.

41. Although intimidating to the agitated TBI-disabled Plaintiff, individual 5 was nice to the Plaintiff and even got this Plaintiff tissues so that the Plaintiff could wipe away the Plaintiff's tears.

305  42. The Plaintiff told individual 5 that because of the Plaintiff's traumatic brain injury, at times, the Plaintiff has emotional dysregulation as the Plaintiff did at that moment. Individual 5 understood this. Individual 5 told the Plaintiff that individual 5 had a friend with a brain injury who has similar, non-violent, emotional dysregulation. After some time, another female staff member came in the room who is referred herein to as individual 7.

310  43. Individual 7 held of a one-page piece of paper out towards the Plaintiff and offered the Plaintiff a pen. As individual 7 offered the Plaintiff the pen, individual 7 told TBI-disabled

Plaintiff in his state of confusion and declined executive functions, that if the TBI-disabled Plaintiff would sign this line on the paper where Individual 7 motioned to cue the location of the line to the TBI-disabled Plaintiff, then Plaintiff could can leave and go home.

315   44.   The TBI-disabled Plaintiff took the pen, and then individual 7 directed the TBI-disabled Plaintiff, who was in his state of confusion and declined executive functions, by pointing to the line where the TBI-disabled Plaintiff was to sign if the TBI-disabled Plaintiff wanted to leave the hospital. The TBI-disable Plaintiff in his current state of mind signed the line on the one page, and then individual 7 took the one-page form with the TBI-disabled

320   Plaintiff's signature from the Plaintiff. Then, individual 7 handed the TBI-disable Plaintiff in his current state of mind a bunch of papers.

45. Next, I was escorted out of the facility by the armed guard, and then taken to my car by a coworker in security in his car. My phone's GPS guided my home.

46. Soon afterwards when the Plaintiff left the hospital and drove home, the TBI-

325   disabled Plaintiff realized that individual 7 pulled a "bait and switch" maneuver on him, a TBI-disabled individual who just a few hours ago had a concussive event causing confusion and a decline in his executive functions and who was still in pain in his mid-back and discomfort in his neck.

47. During the TBI-disabled Plaintiff's visit, the DEFENDANTS never claimed any undue

330   financial, administrative, or operational burdens to the Plaintiff's requested preferred method of effective communication. Furthermore, the DEFENDANTS acted with deliberate indifference to the Plaintiff's requested preferred method of effective communication; the Plaintiff was provided neither any explanation nor a valid explanation as to why the Plaintiff's preferred

method of communication was denied. Furthermore, the TBI-disabled plaintiff was never
335 provided an alternative method of effective communication by the DEFENDANTS to the Plaintiff's preferred method of effective communication that was as effective as the Plaintiff's requested preferred method of effective communication. The TBI-disabled Plaintiff never received a prompt and written explanation from the DEFENDANTS as to why and what the undue burden was for providing the Plaintiff with his preferred method of effective
340 communication.

48. Because of these statue violations regarding Titles II and III of that Americans with Disabilities Act (ADA), as amended, and regarding the Rehabilitation Act of 1973, as amended, and discrimination by the Defendants against the Plaintiff that was based upon the Plaintiff's disability, the Plaintiff was harmed, injured, suffered mental and emotional distress; The TBI-
345 disabled Plaintiff suffered statue violations of civil rights by the DEFENDANTS. The plaintiff was not provide due process, equal protection under the law, and an equal opportunity to benefit from services provided by the DEFENDANTS, the Federal Government and the State of New Jersey.

49. For over one year. The TBI-disabled Plaintiff suffered from an inability to perform
350 several of his "activities of daily living (ADL's)" regularly and normally until the Plaintiff received proper treatment, physical therapy, and medication for the Plaintiff's mid-back pain and lack of range of motion from Doctor B.; The Plaintiff's quality of life and ability to go back to work suffered greatly; The Plaintiff is still out-of-work due partially due to back pain and other traumatic brain injury issues that were exacerbated by this accident. During this time after the
355 visit to Saint Barnabas Medical Center in Livingston, NJ, the TBI-disabled Plaintiff was in

constant pain and had a lack of range-of-motion until the physical therapy was over. Prior to meeting Doctor B, the TBI-disable Plaintiff tried other doctors for his mid-back pains at another hospital system, hospital system B, that specialized in head injuries and where Plaintiff neurologist of record is located.

360   50. The DEFENDANTS actions caused issues at hospital system B with Doctor A. Doctor A refused to treat the TBI-disabled Plaintiff's still occurring pain and stiffness in his mid-back as there was no medical reference to the Plaintiff's mid-back pain from the accident; Instead, the TBI-disabled Plaintiff was repeatedly instructed by Doctor A to see a neuropsychologist for an examination by Doctor A at hospital system B.

365   51. Eventually, the Plaintiff was able to find Doctor B upon recommendations from another doctor and a therapist in Doctor B's medical organization, medical organization A. Doctor B determined that the injuries to Plaintiff's mid-back were from this auto accident that is discussed in this civil action.

52. Prior to and afterward, the TBI-disabled Plaintiff I used his preferred method of
370   effective communication for various situations regularly without much difficulty, but some uncommon difficulties occurred sometimes by less than somewhat uncommonly occasionally. Usually, such difficulties with the Plaintiff's preferred method of effective communication issues are corrected at a reasonable time that does not interfere with the Plaintiff's understanding of the Plaintiff's medical treatments and answers to his medical questions.

375   53. For example, when the Plaintiff's preferred method of effective communication needs the aid of recorded audio medical information and answers to the Plaintiff's questions, Doctor B at the Kessler Institute for Rehabilitation has an uncomplicated way of

accommodating the Plaintiff's request for preferred effective communication of recording as Kessler regularly does for other patients who makes the same type of request for their
380    preferred method of effective communication.

54. When the Plaintiff asked doctor B to allow the Plaintiff to record doctor B, Doctor Bh has a method that lets Doctor B his medical examination first. When Doctor B's examination is complete, Doctor B allows his patients to record his findings and provides answers to the patients' questions. So simple! - Kessler Institute for Rehabilitation is ranked 4th in the Nation
385    for rehabilitation.

55. This incident in this civil action is not the only time the TBI-plaintiff's preferred method of effective communication was denied by corporate defendant 2, RWJBarnabas Health. Subsequently, at a different facility of RWJBarnabas Health in New Jersey in 2020 and 2021, the Plaintiff's repeated requests of his preferred method of communication of effective
390    communication that was appropriate for the Plaintiff's current situation at this other RWJBarnabas facility was denied. Staff who repeatedly denied the Plaintiff's request for his preferred method of effective communication was not a medical doctor repeatedly at this other facility; the Plaintiff had to send a fax to the doctor explaining the legalities of the Plaintiff's request preferred method of effective communication and how not following the
395    Plaintiff's request could legally affect medical Doctor C. This medical Doctor, doctor C, was at hospital X was a gentleman about Plaintiff's request for his preferred method of effective communication because Doctor C understood the information in the Plaintiff's fax to Doctor C.

56. This civil action against the DEFENDANTS is important to the public, especially in New Jersey, because RWJBarnabas Health claims, on their website, to be "The Largest

400    Academic Healthcare System in New Jersey- RWJBarnabas Health (https://www.rwjbh.org/why-rwjbarnabas-health-/ Why Choose RWJBarnabas Health | New Jersey Health System (rwjbh.org))

57. Without correction to the DEFENDANTS' wrong doings of violations of civil rights for effective communication of disabled individuals with a traumatic brain injuries, this and similar
405    violations of effective communication under the ADA, as amended, and the Rehabilitation Act of 1973, as amended, could occur by many individuals in the healthcare field that were wrongly taught and trained about this important civil rights matter by RWJBarnabas Health.  These individuals include, but are not limited to, new healthcare students, healthcare providers, and staff at RWJBarnabas facilities in New Jersey.

410    58. A continuation of teachings of such wrong doings about civil rights of the disabled individuals with traumatic brain injuries would have a great negative effect on many individuals medically treated by RWJBarnabas and who are trained and work for RWJBarnabas Health in the healthcare industry for years, if not decade, to come, not to mention the negative effects on the medically injured who seek RWJBarnabas Health and the DEFENDANTS for their public
415    services.

**Relief Sought**

59. The TBI-disable Plaintiff seeks more than one type of relief.

60. The TBI-disable Plaintiff seek compensatory damages for the injury and harm to him from the statute violations where the Plaintiff was discriminated against on the basis of his
420    disability and where the Plaintiff was not provided his preferred method of effective

communication for his disability and for the situation by the DEFENDANTS. The compensatory damages amount to $1,000,000.00 (one million dollars) for pain, suffering and mental anguish.

61. The Plaintiff seeks unknown monetary damages at this time for his legal fees and expenses related to this civil complaint; The monetary damage sought would be equivalent to the total hourly rate of the attorneys that may be hired by the DEFENDANTS for this civil complaint as well as similar expense rates by such hires.

62. The Plaintiff seeks punitive damage from the DEFENDANTS in the amount of $24,000,000.00 (twenty-four million dollars) for violations of his civil rights related to the statute violations under Title II and III of the Americans with Disabilities Act, as amended, under the Rehabilitation Act of 1973, as amended, for discrimination based upon his disability, and for denying the Plaintiff his preferred method of effective communication as per the laws and regulations of the United States of America.

63. Furthermore, the Plaintiff seeks injunction relief for a minimum of ten years with ongoing oversight for developing and employing policies and effective training methods by the DEFENDANTS for medical, administrative, and other staff regarding effective communication for disabled individual who have traumatic brain injuries and the associated afflictions with traumatic brain injuries.  The injunction relief that is requested by the TBI-disabled Plaintiff is to have effective policies and information describing the effects on individuals who have various types of traumatic brain injuries and associated afflictions of related deficiencies including, but not limited to, deficiencies to expression, communication, executive functions, sound, light, rate of speech, language usage, physical limitation, information content, etc.

64. The plaintiff humbly requests this relief from the Court, or any other relief that the Court deems appropriate for this complaint.

445

I declare under the penalty of perjury that the foregoing is true and correct.

Signed this 15th day of March, 2021.

Signature of Plaintiff and Pro Se: *[signature]*

450  Mailing Address:   Robert C. Dalton
24 Maryland Rd.
Little Egg Harbor Twp., NJ 08087
Telephone: 609-879-1797
Email: rca.dalton@gmail.com

455

460

465

470