

UNITED STATE DISTRICT COUT; |

DISTRICT OF NEW JERSEY; NEWARK LOCATION | Case #: 2:21-CV-05354-CCC-ESK

5 |

|

ROBERT C. DALTON, an individual | Civil Action

    *The Plaintiff* |

|

10 v. |

| March 15, 2021

Saint Barnabas Medical Center, a corporate entity, |

RWJBarnabas Health, a corporate entity, |

NICOLE CENTRELLA, an individual, and |

15 Dr. ~~Jane Doe~~ Lauren J. Curato, Individual. |

    *The Defendants* |

|

## AMENDED COMPLAINT

20 **Civil Action:  Civil Lawsuit for Civil Rights Violation involving Discrimination on the Basis of the Plaintiff's Disability by the DEFENDANTS and the DEFENDANTS Denying the Plaintiff his Civil Rights regarding The Plaintiff's Preferred Method of Effective Communication for the Plaintiff's Disability Under the Americans with Disabilities Act (ADA), as amended, and the Rehabilitation Act of 1973, as amended, . <u>Additionally, this Civil Lawsuit is for Fraudulent**
25 **Representation with regards to 42 CFR § 482.24</u> condition of participation: Medical Records Services. The Plaintiff Seeks Damages totaling $25,000,000.00 plus legal fees and other related compensation for these civil rights violations and related harm and injury.**

30

### i. Preface

1. The TBI-disabled Plaintiff requests that the Court note that the Plaintiff is medically document with afflictions having several long-term and permanent deficiencies. These deficiencies are due to a moderate to severe traumatic brain injury (TBI) that occurred in 2012, and then these deficiencies were exacerbated with two subsequent concussive events: one in 2017 and another in 2019. The TBI-disabled Plaintiff has expression difficulties, various executive function deficiencies, photophobias related to light wavelength and intensity photophobias, phonophobia, depressed energy levels, and other. The TBI-disabled Plaintiff is documented with aphasia and tangential, circumstantial (circumstantial meaning "*of description containing full details'*), and verbose communications.

2. The Plaintiff humbly request that the Court consider the Plaintiff's disabilities during the proceeding of this civil action. Often the Plaintiff needs more time complete tasks and has difficulty expression himself.

### 1. Parties Involved

3. Plaintiff:  Robert C. Dalton, an individual
24 Maryland Rd
Little Egg Harbor Twp., NJ 08087
Phone: 609-879-1797
Email: rca.dalton@gmail.com
[referred to herein as the "Plaintiff" or "TBI-Disabled Plaintiff"]

4. Defendant 1:  Saint Barnabas Medical Center, a corporate entity,
Stephen P. Zieniewicz, President and CEO
94 Old Short Hills Rd.
Livingston, NJ 07039
Phone: 973-322-5000
www.rwjbh.org/saint-barnabas-medical-center/contact-us/
[referred to herein also as "corporate defendant 1"]

|  |  |  |
|---|---|---|
| 65 | 5. Defendant 2: | RWJBarnabas Health, a corporate entity<br>Barry H. Ostrowsky, President and CEO<br>95 Old Short Hill Rd.<br>West Orange, NJ 07052<br>Phone: 888-724-7123<br>www.rwjbh.org/contact-rwjbarnabas-health/<br>[referred to herein also as "corporate defendant 2"] |
| 70<br><br><br>75 | 6. Defendant 3: | Nicole Centrella, an individual<br>94 Old Short Hills Rd.<br>Livingston, NJ 07039<br>Phone: 973-322-500<br>www.rwjbh.org/saint-barnabas-medical-center/contact-us/<br>[referred to herein also as "individual 1"] |
| 80 | 7. Defendant 4: | ~~Dr. Jane Doe,~~ Dr. Lauren J. Curato, an individual<br>*(Dr. Jane Doe was the Head of the Emergency Room (ER)<br>at the time of my visit to the ER)*<br>94 Old Short Hills Rd.<br>Livingston, NJ 07039<br>Phone: 973-322-500<br>www.rwjbh.org/saint-barnabas-medical-center/contact-us/<br>[referred to herein also as "individual 2"] |

85

8. Collectively, corporate defendant 1, corporate defendant 2, individual 1, and individual 2 are referred to herein as the "DEFENDANTS".


90 **2. Basic for Jurisdiction**

9. The basis for Jurisdiction is a Federal Question pertaining to the Americans with Disabilities Act (ADA), as amended. More specifically, Title III of the ADA, as amended pertaining to the effective communication. And, Section 504 of the Rehabilitation Act of 1973, as amended, regarding effective communication.

95     10. Moreover, the Plaintiff's civil rights of due process and equal protection under the law under the 14th Amendment and due process under the 5th Amendment were violated by the Defendants.

11. Furthermore, the basis for Jurisdiction 29 USC §794 Non-discrimination under Federal Grant and programs. More specifically, corporate entity 1 and corporate entity 2 is

100    subject to 29 U.S. Code 794 (b)(3)(A)(ii) since these state corporate entities are principally engaged in the business of health care.

12. The United States District Court: District of New Jersey; Newark location has subjected matter, specific and personal jurisdiction in this matter. This civil action arises out of action in Livingston, New Jersey.

105    13. Moreover, the damage exceeds the about of $75,000.00

### 3. Matters of Law

14. The *pro se* TBI-disabled Plaintiff refers to the document on Effective Communication from the Disability Rights Section of the Civil Rights Division of the United States Department of

110    Justice Document that is found in Appendix A for references to the matters of law.

15. The Plaintiff believes the matters of law pertain to Titles II and III of the Americans with Disability Act (ADA), as amend, and this law is believed to be 42 U.S. Code; Chapter 126 Equal Opportunity for Individual with Disabilities. More, specifically to law and regulations under this ADA for "effective communication" and "communication" , Furthermore, the TBI-

115    disabled Plaintiff believes that the matters of law pertain to The Rehabilitation Act of 1973, as amended, and this law is believed to be 29 U.S. Code Chapter 16 – Vocational Rehabilitation

and Other Rehabilitation Service inclusive of 29 USC 794, Nondiscrimination under Federal grants and program and other related laws and regulation regarding "effective communication" and "communication" under this Chapter.

120    16. <u>Additionally, the matter of law relates to Fraudulent Representation by the all Defendants with regard to 42 CFR § 482.24 Condition of participation: Medical records services. More specifically, the matter of law relates to 42 CFR § 482.2 (b) Standard; Form and Retention of record, 42 CFR § 482.2 (c)Standard: Content of record, 42 CFR § 482.2 (c)(4)(iii), and 42 CFR § 482.2 (c)(4)(vi).</u>

125 **4. Statement of Claim<u>: Preferred Method of Effective Communication.</u>**

17. Corporate defendant 1 is part of corporate defendant 2's healthcare system.

18. Defendant 3 is believed to be the nurse practitioner who provided medical attention to the Plaintiff and who denied the TBI-disabled plaintiff's requested preferred method of effective communication. Thus, defendant 3 violated the civil rights of the TBI-disabled

130 plaintiff.

19. Defendant 4 is director/head doctor of the ER who also denied the TBI-disabled Plaintiff's repeated request for his preferred method of effective communication and who put the non-violent, non-aggressive Plaintiff under armed guard in a private room. (Prior to being under armed guard, the Plaintiff made multiple requested to defendants 3 and 4 to change

135 location for examination and waiting inside the ER due to his phonophobia. The TBI-disabled Plaintiff's requests to be removed to an area that was much more quieter compared to the ER were refused multiple times by defendant 3 and 4. Moreover, the local noise in the ER was exacerbated the Plaintiff's decline in executive function on top of the decline in the Plaintiff's

executive functions due the accident; The emergency room environment had too much noise
140 and distractions for the plaintiff causing more confusion, forgetfulness, and decline in executive functions in the TBI-disabled Plaintiff, and then the Plaintiff's confusion, forgetfulness and decline in executive functions were being worsened by the agitation being cause the rapid, illogical banter from defendants 3 and 4 as they refused the Plaintiff's requests for accommodation and his preferred method of communication.)

145        20. The TBI-disabled Plaintiff was disabled with a traumatic brain injury and made all the staff that he encountered at Saint Barnabas Medical Center aware that he was disabled with complications due to a moderate to severe traumatic brain injury. The DEFENDANTS operation was a place of public accommodation. The TBI-disable Plaintiff was denied his public accommodation of his preferred method of effective communication due to his disability [The
150 Court should note that Saint Barnabas Medical Center regularly accommodates people with other disabilities as even stated on their website; However, Saint Barnabas Medical Center did not accommodate preferred effective communication for the Plaintiff's disability, a traumatic brain injury].

        21. The TBI-disabled Plaintiff has a medically established disability. The Plaintiff's
155 disability was known to the Defendants. The Plaintiff requested accommodation for his disability so the Plaintiff and benefit of a service with equal opportunity as people without the Plaintiff's disability. The DEFENDANTS repeatedly denied the TBI-disables Plaintiff's requested accommodation for his disability. The DEFENDANTS discriminated against the Plaintiff on the Basis of the Plaintiff's disability

160      22. The TBI-Plaintiff has a disability.  The Plaintiff's disability has a communication and expression disability that affects the Plaintiff's executive functions.  These aspects of the Plaintiff's disability were made know to the DEFENDANTS.  The Plaintiff's requested accommodations for his disability.  The Plaintiff repeatedly requested that the DEFENDEDANTS provide the Plaintiff's preferred method of effective communication for his disability and the

165      current situation.  The DEFENDANTS repeatedly denied the Plaintiff's requests for his preferred method of effective communication.  The DEFENDANTS refused to provide the Plaintiff with an alternative to his requested preferred method of communication that was as effective in communication for the situation at hand as the Plaintiff requested.  The DEFENDENTS refused and failed to provide the Plaintiff with an explanation regarding how and why the Plaintiff's

170      repeatedly requested preferred method for effective communication for the situation was an undue burden financially for the DEFENDANTS.  The DEFENDENTS refused and failed to provide the Plaintiff with an explanation regarding how and why the Plaintiff's repeatedly requested preferred method for effective communication for the situation was an undue burden administratively for the DEFENDANTS.  The DEFENDANTS refused and failed to provide the

175      Plaintiff with an explanation on how and why the Plaintiff's requested preferred method of effective communication would fundamentally alter the nature of the DEFENDANTS program and/or activities at hand.

23. Furthermore, with deliberate indifference, the DEFENDANTS refused and failed to provide the Plaintiff with a written statement by an individual with the  proper authority to

180      provide the Plaintiff with such written statement as to how and why the Plaintiff's requested preferred method of effective communication would fundamentally alter the a nature of the

program and or activity, how and why this request would be a undue financial burden upon the DEFENDANTS, and/or how and why this request would be and undue administrative burden upon the DEFENDENTS. Furthermore, with deliberate indifference, the DEFENDANTS refused and failed to provide the Plaintiff with a written statement by an individual with the proper authority stating to the Plaintiff an alternative method of effective communication that would be as effective as the Plaintiff's requested method of effective communication for his disability in the current situation and that would be as effective as would be for individuals without the Plaintiff's disability and aspects of his disability. or activity, how and why this request would be a undue financial burden upon the DEFENDANTS, and/or how and why this request would be and undue administrative burden upon the DEFENDENTS. Furthermore, no written statement on this matter was provided by the DEFENDANTS.

24. During the afternoon on March ~~14~~ 15, 2021, the TBI-disabled Plaintiff was traveling to the West Orange, NJ campus to the Kessler Institute for Rehabilitation for a scheduled session for ongoing research in brain injuries by Kessler, when the TBI-disabled Plaintiff was in a car accident. The other drive fails to stop her car in time, and subsequently the other driver's car hit the Plaintiff's car from behind. See Exhibit 1 for details of car accident.

25. Emergency and traffic safety personnel arrived on the scene.

26. The TBI-disabled plaintiff was offered an ambulance to a hospital. Despite being a bit confused and disorientated, the TBI-Plaintiff elected to drive his car to the nearest hospital with the aid of GPS on the phone. The Plaintiff had a difficult decision to make, because of his dire financial position. Had the Plaintiff took an ambulance to hospital, the Plaintiff could not afford to get his car out of the impoundment, pay for towing, and/or pay for a taxi to take him

100 miles to the Plaintiff home.  The Plaintiff's car was drivable, and the authorities onsite at
205   the accident allowed the Plaintiff to drive to the hospital.

27. The Plaintiff reported to the authorities on the seen about back pain in the up and down the spine and a bit of disorientation.

28. The Plaintiff arrived at the ER of Saint Barnabas Medical Center in Livingston, NJ. During the admittance, the Plaintiff disclosed to the admitting staff that he was disabled from a
210   moderate to severe TBI in 2012, and the current accident was causing him much pain in his back at the mid-spine with some discomfort in his neck as well as being a bit out of sorts mentally with from the impact. After being admitted and sent to the waiting area, the Plaintiff was called into the ER for examination and any medical treatment.

29. The TBI-disabled Plaintiff was seated alone in a small private area that was
215   surrounded by curtains where he was out of view from others and others were out of view from him.  The noise and distractions began to bother and agitate the plaintiff making the Plaintiff a bit confused.  A healthcare provider came into the area to examine the Plaintiff.

30. The Plaintiff was initially examined by defendant 3.

31. The Plaintiff became confused by the questioning of the examiner and the
220   examiner's answers when the Plaintiff complained about the large amount of pain in his mid-back and neck discomfort.  The defendant 3 explained to defendant 3 that his back hurt where previous facture damage to his transverse, spinous, and other processes of his spine after his TBI-disabling accident where he was thrown from his car in 2012.  Defendant 3 refuse to do any imaging.  The Plaintiff repeatedly complained to Defendant 3 as he became more confused.
225   Next, the Plaintiff request that defendant 3 provided the TBI-disable plaintiff  his preferred

method of communication that was to record the verbal information that defendant 3 was providing for treating and why. [The plaintiff had a good understanding of HIPPA requirements and his rights as well as others right under HIPPA. Also, the Plaintiff understood his civil rights under the ADA, as amended, and the Rehabilitation Act of 1973, as amended [especially after

230  being disabled by a traumatic brain injury as well as State and Federal law for recording conversations. The plaintiff had been employed by a healthcare insurance company, medical supply companies and had been a pharmaceutical sample representative]

32. Defendant 3 repeated refused to provide the Plaintiff with is preferred method of effective communications. The noise from the error and the rapid, illogical banter from

235  Defendant 3 was making the Plaintiff more confused as the TBI-disabled Plaintiff was becoming aware that his executive functions were declining as the TBI-disabled Plaintiff was aware that he was starting to have aphasia and more confusion. The Plaintiff continue to state his concern and request for his preferred method of communication that to tape what Defendant 3 was informing him regarding the state of his injuries; the Plaintiff was having trouble understanding

240  logic of Defendant 3 in the face of his mid-back and neck pain and stiffness.

33. The Plaintiff had great concerns about possible damage to his neck's nervous system and his mid-back after this recent concussive impact; the Plaintiff was keenly aware that concussive events post an initial traumatic brain injury typically cause great deficiencies in executive functions, energy, and mobility – this is well-note by the TBI-disabled plaintiff from

245  expert healthcare provide with specialty in brain injuries.

34. Defendant 3 continue to refuse the Plaintiff preferred method of effective communication and his request of imaging of his neck and mid-back because of the pain [the

neck is where a nerve system is located]. At this point, the noise in the ER was overwhelming the Plaintiff, and this noise continued to agitate the Plaintiff and causing his executive function
250    to decline.

35. Next, the Plaintiff ask defendant 3 repeated to be move to a quieter location, his preferred method of communication, and for imaging of his neck and mid-back, but defendant 3 continued to refuse al of the Plaintiff's requests.  Next, the Plaintiff request to speak with a doctor because Defendant 3 was a nurse practitioner.  Defendant 3 went and got a superior
255    who was a doctor and the present head of the ER, defendant 4, to talk to the Plaintiff.

36. Once again, the TBI-disable Plaintiff repeatedly pleaded, as a gentleman, to accommodate the plaintiff's requests with Defendant 3 and 4.  The requests were 1) to be move to a quieter location so the ER noise would not continue to agitate the plaintiff and continue the decline in his executive function including confusion, aphasia, holding thought,
260    etc., 2) to allow the TBI-disabled plaintiff to use his phone to record the audio of the medical information and answers being spoken by defendants 3 and 4 to the Plaintiff's questions about his medical condition, his pain, etc.; the plaintiff requested this preferred method of communication of recording  because of the decline in his executive functions, and 3) imaging of his mid-back and neck.  Defendant 4 said that she would find an accommodation for the
265    noise and provide me imaging of my lower back and neck.  Then, I asked for imaging where my pain actually was, my mid-back.

37. Again,  asked for the area where my pain was radiating from in my mid-back to be imaged, and Defendant 4  said, "ok".   Next, defendant 4 left the area to find a place for me

without noise. Defendant 3 told me that I was going to have my mid-back x-rayed. Next, I left
270 for x-ray, and when I was leaving the area to get the x-rays.

38. When I got to the x-ray room, I asked the x-ray technician who was operating the machine, if there was an order for x-rays of my mid-back. He said, "no".

39. After the x-rays were completed, I was taken to a private examination room in the ER having solid walls all around with a door to the hallway. Next, the defendant 4 and an
275 armed security guard came in the room with his hand resting on his holstered gun. Again, I made requests that were not yet provided to me: a) I formed defendant 4 that I needed to record the information medical information that she was telling me and the answers to my questions because I did not understand why she was not providing me with imaging of my lower back, but not where I had much pain; my mid-back, the place that was previously injured.
280 Furthermore, at this time, my executive functions were declining again from the anxiety of having an arm guard with his had resting on his holster gun where the handle to his pistol was (referred to herein as individual 50. Furthermore, I was still confused about the medical information that was being provide to me by defendant 4.; and b) once again, I asked defendant 4 for imaging of my mid-back where my pain was. I receive a "weird answer"
285 without an explanation from Defendant 4, then she left.

40. Defendant 4's weird answer about imaging was "the artificial intelligence software told her only to image my lower back". No further explanation was provided to me. I remained in the room with individual 5, the armed security guy. The cost for the x-ray of my back is estimated, based upon the cost the x-ray of my lower back, to be $59 (fifty-nine dollars);
290 besides I was already in the x-ray room and on the table for the x-ray machine.

41. After defendant 4 left this private room, I was alone being very anxious and nervous with individual 5 with his arm resting upon his holstered guy. I told individual 5 that I have not been here to cause trouble, and I have no plans to cause trouble. I will resolve this issue after I leave the facility by legal means. Soon after the emotional dysregulation became exacerbated from this auto accident, and I began to get emotional, crying.

42. Individual 5 was nice to me and even got me tissues to wipe my tears. I told individual 5 that because of my traumatic brain injury, at times, I have emotional dysregulation as I did at that moment. He understood this. He said to me that he had a friend with a brain injury that has similar, non-violent, emotional dysregulation. After some time, another female staff member came in the room. She held of one page of paper and offered me a pen. As she offered me the pen, she told if I signed this line on the paper, then I can leave. I took the pen, and then she pointed to the line where I was to sign if I wanted to leave. I signed the line on the one page, and she took the one page from. Then, she handed me a bunch of papers. Soon afterwards, I realize she pulled a bait and switch maneuver on me, a TBI-disabled individual who just a few hours ago had a concussive event causing confusion and a decline in his executive functions and who was still in pain in his mid-back and discomfort in his neck.

43. Next, I was escorted out of the facility by the armed guard, and then taken to my car by a coworker in security in his car. My phone's GPS guided my home.

44. During my visit, the DEFENDANTS never claimed any undue financial, administrative, or operational burdens to my requested preferred method of effective communication. Furthermore, the DEFENDANTS acted with deliberate indifference to my requested preferred method of effective communication; I was provided neither any explanation nor a valid

explanation as to why my preferred method of communication was denied. Furthermore, I was never provided an alternative effective communication by the DEFENDANTS to my preferred

315   method of effective communication that was as effective as my requested preferred method of effective communication. I never received a prompt and written explanation from the DEFENDANTS as to why and what the undue burden was for providing me with my preferred method of effective communication. I was harmed, injured, suffered mental and emotional distress; I suffered statue violations of civil rights by the DEFENDANTS.

320   45. For over one year I suffered from an inability to perform several of my "activities of daily living (ADL's)" regularly until I receive proper treatment, physical therapy and medication, for my mid-back pain and lack of range of motion from Doctor B.; my quality of life and ability to go back to work suffered greatly; I am still out-of-work due partially due to back pain and other traumatic brain injury issues that were exacerbated by this accident. I was in constant

325   pain and had a lack of range-of-motion until the physical therapy was over. Previously, I had tried other doctors for my back pains at another hospital system, hospital system B that specialized in head injuries and where my neurologist is located. The DEFENDANTS actions caused issues at hospital system B with Doctor A. Doctor A refused to treat my still occurring pain and stiffness in my mid-back as there was no medical reference to my mid-back pain from

330   the accident; Instead, I was repeatedly instructed to see a neuropsychologist for an examination by Doctor A at hospital system B. Eventually, I was able to find Doctor B upon recommendations from another doctor and a therapist in Doctor B's medical organization, medical organization A. Doctor B determine that the injuries to my mid-back were from this auto accident that is discussed in this civil action.

335     46. Prior to and afterward, I had used my preferred method of communication for various situations without much difficulty occurring regularly, but some difficulty somewhat uncommon occasionally. Usually, such effective communication issues are corrected at a reasonable time that does not interfere with my understanding of my medical treatments and answers to my medical questions.

340     47. For example, when my preferred method of communication is the need to record medical information and answers to my questions, Doctor B at the Kessler Institute for Rehabilitation has an uncomplicated way of accommodating my request for preferred communication of recording as Kessler regularly does for other patients who makes the same type of preferred method of effective communication requested. When I asked Dr. B to allow

345     me to record him, his method is to let him do the examination first. When his examination is complete, he allows his patient to record his findings and provides answers to the patient's questions. So simple!  Kessler is ranked 4th in the nations for rehabilitation.

        48. This incident in this civil action is not the only time my preferred method of communication was denied by corporate defendant 2, RWJBarnabas Health. Subsequently, at a

350     different facility of RWJBarnabas Health in New Jersey in 2020 and 2021 denied my repeated requests of my preferred method of communication of effective communication that was appropriate for me in the situation at this other RWJBarnabas. Staff that was not a medical doctor repeatedly denied my request at this other facility; I had to send a fax to the doctor explaining the legalities of my request and how it my legally affect him. This medical Doctor,

355     doctor C, was a hospital X was a gentleman about my request because he understood my fax to him.

49. This civil action against the DEFENDANTS is important to the public, especially in New Jersey, because RWJBarnabas Health claims, on their website, to be "The Largest Academic Healthcare System in New Jersey- RWJBarnabas Health (https://www.rwjbh.org/why-

360  rwjbarnabas-health-/ Why Choose RWJBarnabas Health | New Jersey Health System

(rwjbh.org))

50. Without correction to wrong doings of violations of civil rights for effective communication of disabled individuals with a traumatic brain injury by RWJBarnabas Health, this and similar violations of effective communication under the ADA, as amended, and the

365  Rehabilitation Act of 1973, as amended, many individuals in the healthcare field will be wrongly taught about this important civil rights matter by RWJBarnabas Health. This individual include, but are not limited to, new healthcare students, their healthcare providers, and their staff. A continuation of teachings of such wrong doings about civil rights of the disabled individuals with traumatic brain injuries would have a great negative effect on many individuals medically

370  treated by RWJBarnabas and who are trained and work for RWJBarnabas Health in the healthcare industry for years, if not decade, to come, not to mention the negative effects on the medically injured seek RWJBarnabas Health and the DEFENDANTS for their public services.

### 5. Statement of Claim: Fraudulent Representation of Medical Records

51. The Claim is directed to all the Defendants.

375  52. On May 19, 2021, the Plaintiff went to St. Barnabas Hospital in Livingston, NJ to obtain any medical records so the Plaintiff could determine the name of Defendant 4 (Dr. Lauren J. Curato). For quite some time, the TBI-disabled Plaintiff could not make the proper connection as to how to obtain the name of Defendant 4. Once the Plaintiff made the proper

connection as to how to determine the name of Defendant4, the Plaintiff addressed the issue
380  by going to the medical records department at said hospital.

53. (The forced-upon discharge summary that the Plaintiff was told that he had to sign to leave the hospital did not contain the name of Defendant 4. Oddly, only the name of Defendant 3 was on said summary.)

54. Subsequently, The Plaintiff made the proper request through the proper channels
385  with help from several members of the hospital staff on May 18, 2021.

55. After receiving what medical records that the medical records department was allowed to provide the Plaintiff, the Plaintiff could not determine who the attending physician was (Defendant 4). Next, the Plaintiff asked floor staff to direct the Plaintiff to the Emergency Room areas where Plaintiff might be able to determine the name of Defendant.

390  56. A managing staff member of the Emergency Room examined the medical records on hand of the Plaintiff (just received medical records). The managing staff member pointed out to the Plaintiff where and how the name of Defendant 4 is listed it the notes that the Plaintiff had on hand. The name listed was Curato.

57. When the Plaintiff returned home, he searched the internet for the full name of
395  Defendant 4; Defendants full name was found to be Dr. Lauren J. Curato.

58. Sometime soon thereafter, a couple of days or more, the Plaintiff read the notes, and the Plaintiff found that no records of the Plaintiff's requests for his preferred effective communication method nor the denial of the Plaintiff's said repeated request were found in any of the notes by the Defendant. Also not found were notes about the armed guard, the
400  Plaintiff's emotional dysregulation (crying), the armed guard's assessment of the Plaintiff, the

Plaintiff's repeated requests for imaging of the Plaintiff mid-back (thoracic section of back) pain and hurt that was the main issue of his back, the Defendants' repeated denials of the Plaintiff's imaging requests of his thoracic section where the most pain and stiffness was occurring.

59. The Defendants actions were deliberate acts to protect themselves against having any evidence of the Defendants' disability discrimination.

60. The Plaintiff could reasonably expect the Defendants would keep accurate medical records of pertinent diagnosis, the patient's response to services, and events to the care of the Plaintiff as described in the matters of law pertaining to 42 CFR 482.24 and the cited subsections above.

61. The Defendants actions harmed the Plaintiff by the Defendants gaslighting and not recording material facts to the Plaintiff's claim of disability discrimination. The Defendants actions cause pain and suffering to the Plaintiff.

62. The Defendants had a duty to accurately record written records pertinent to the Plaintiff's visit. The Defendants fraudulent represented the Plaintiff's medical records. The fraudulent representation did not accurately describe the patient's (the Plaintiff's) progress and response to services provided. Furthermore, the Defendants purposely, intentionally, and knowingly omitted such information to protect themselves from any possible legal action by the Plaintiff: Thereby the Defendants intentionally, knowingly, and willfully chose to commit fraudulent representation of the Plaintiff's medical records; The Defendants' action were directly intended to harm and cause suffering to the TBI-disabled Plaintiff.

63. The Defendants' fraudulent actions are evil and criminal.

64. <u>The Plaintiff's had a need for reasonable reliance upon true and accurate medical records, but the Defendants' fraudulent actions prevented this reliance (Plaintiff and Federal Government expect that the Defendants follow the matters of law). The Defendants</u>

425 <u>intentionally failed to follow the laws and regulation of the Federal Government for medical record keeping. The result of the Defendants fraudulent action is a substantial factor in causing harm to the TBI-disabled Plaintiff.</u>

**6. Relief Sought**

65. The TBI-disable Plaintiff seeks more than one type of relief.

430 66. The TBI-disable Plaintiff seek compensatory damages for the injury and harm to him from the statute violations where the Plaintiff was discriminated against on the basis of his disability and where the Plaintiff was not provided his preferred method of effective communication for his disability and for the situation by the DEFENDANTS. The compensatory damages amount to $1,000,000.00 (one million dollars) for pain, suffering and mental anguish.

435 <u>Also, such compensatory damage for injury and harm to the Plaintiff from the Defendants' Fraudulent Representation in the Plaintiff's medical records.</u>

67. The Plaintiff seeks unknown monetary damages at this time for his legal fees and expenses related to this civil complaint; The monetary damage sought would be equivalent to the total hourly rate of the attorneys that may be hired by the DEFENDANTS for this civil

440 complaint as well as similar expense rates by such hires.

68. The Plaintiff seeks punitive damage from the DEFENDANTS in the amount of $24,000,000.00 (twenty-four million dollars) for violations of his civil rights related to the statute violations under Title II and III of the Americans with Disabilities Act, as amended, under

the Rehabilitation Act of 1973, as amended, for discrimination based upon his disability, ~~and~~ for
445 denying the Plaintiff his preferred method of effective communication as per the laws and regulations of the United States of America<u>, and for Fraudulent Representation of the Plaintiff's medical records.</u>

69. Furthermore, the Plaintiff seeks injunction relief for a minimum of ten years with ongoing oversight for developing and employing policies and effective training methods by the
450 DEFENDANTS for medical, administrative, and other staff regarding effective communication for disabled individuals who have traumatic brain injuries and the associated afflictions with traumatic brain injuries.  The injunction relief that is requested by the TBI-disabled Plaintiff is to have effective policies and information describing the effects on individuals who have various types of traumatic brain injuries and associated afflictions of related deficiencies including, but
455 not limited to, deficiencies to expression, communication, executive functions, sound, light, rate of speech, language usage, physical limitation, information content, etc.

70. The plaintiff humbly requests this relief from the Court, or any other relief that the Court deems appropriate for this complaint.

460 I declare under the penalty of perjury that Plaintiff believes that the foregoing is true and correct.

Signed this 15th day of July 2021.

Signature of Plaintiff and Pro Se _____

465 Mailing Address: Robert C. Dalton
24 Maryland Rd.
Little Egg Harbor Twp, NJ 08087
Telephone: 609-879-1797
Email: rca.dalton@gmail.com