| | |
|---|---|
| United States District Court, | |
| District of New Jersey, Newark Location | |
| | |
| Robert C. Dalton, a disabled individual | Case #: 2:21-CV-05354-CCC-ESK |
| _The Plaintiff_ | |
| v. | |
| Saint Barnabas Medical Center, _a corporate entity,_ | Civil Action |
| RWJBarnabas Health, _a corporate entity,_ | |
| Rutgers University, the State University of N.J., _a corporate entity and vassal of the State of N.J.,_ | |
| State of New Jersey, | |
| Hackensack Meridian Health, _a corporate entity,_ | January 3, 2023 |
| HMH JFK University Medical Center, _a corporate entity and a vassal of Rutgers University, the State University of New Jersey,_ | |
| Jonathan S. Holloway, _an individual,_ | |
| Bill Troy, _an individual,_ | |
| Andy Anderson, _an individual,_ | |
| Brian L. Strom, _an individual,_ | |
| Robert C. Garrett, _an individual,_ | |
| Barry H. Ostrowsky, _an individual,_ | |
| Amie Thornton, _an individual,_ and | |
| ~~Nicole Centrella, an individual, and~~ | |
| ~~Lauren, J. Curato, an individual~~ | |
| Dr. Levine. _An individual_ | |
| _The DEFENDANTS_ | |

2024 JAN -3  P 6: 39
U.S. DISTRICT COURT
DISTRICT OF NEW JERSEY
RECEIVED
CLERK

## SECOND AMENDED COMPLAINT

**CIVIL ACTION:  Civil Lawsuit for Civil Rights Violations involving Unlawful Discrimination on the Basis of Disability regarding accessibility by denying the Plaintiffs Preferred Methods of Effective Communication by denying auxiliary aids and service,  Lack of Information, and Lack of Signage for the Plaintiff's Disability under the Americans with Disabilities of 1990 (referred to herein as ADA), the**

Rehabilitation Act of 1973 (referred to herein as the RE73), both as amended, Deprivation of Civil rights, Conspiracy to Deprive Civil Rights, the New Jersey Patients' Bill of Rights and other law matters. The Defendants acted with gross negligence, purposely failed to act and other.   Furthermore, this Civil Action involves Claims having Supplemental Jurisdiction for claims that are derived from a common nucleus of operative facts; State and Federal claims are related to the New Jersey's Patient Bill of Rights, misleading conduct, negligence, deprivation of civil rights, and unconscionable adhesion contracts having both procedural and substantive unconscionability and that required these contracts to be signed under duress with intimidation, deception, impairment, obfuscation, and misleading statement, and without accessibility for the deficiencies related to the Plaintiff's disability.  The Plaintiff seeks remedies in law and equity with unspecified damages over $20,000,000.00 plus punitive damages in excess $100 million, legal fees and other damages.

### i. Preface

1. This Second Amended Complaint has two main parts.  The First Part, Part 1, and the Second Part, Part 2,

2. Part 1 involves new claims against new Defendants and one of two remaining original Defendants, RWJBarnabas Health, as per Order by the Court (ECF No.35).

3. Institutionalized unlawful discrimination on the basis of disability, gross negligence with malicious intent, derivation of civil rights, and conspiracy to deprive civil rights have been occurring for almost six years by the corporate defendants and their leadership with respect to Federal and State law that have a common

4. The Court granted the Plaintiff additional time to file with Leave for more claims [ECF No.] that are related to these other claims mentioned in [ECF 37].  These other claims mentioned in the original complaint [ECF No. 1] and amended complaint [ECF No.5] are against another RWJ Barnabas Health facility known as Rutgers Health.   Rutgers Health is located in New Brunswick NJ, and Rutgers Health is part of Rutgers University.  Rutgers University is a vassal of the state of New Jersey.

5. Moreover, new claims against Rutgers Health are extended to another hospital in another hospital system.

6.  In Part 1, new claims are against Rutgers Health and are against their partner healthcare hospital facility, HMH JFK University Medical Center, and new claims are against the Hackensack Meridian Health system.  HMH JFK University Medical Center is part of the Hackensack Meridian Health system.

7. In Part 1, new claims are against professional individuals who are responsible for causing the Plaintiff gross harm with malicious intent.

8. These new claims are against a doctor, Dr. Jamie M. Levine and are against other individuals who are executives, present or retired, from the corporate defendants at the time of the unlawful acts.

9. New claims are based upon unlawful discrimination on the basis of disability with deliberate indifference. New claims relate to more unlawful discrimination on the basis of disability regarding accessibility and signage. Other new claims are based upon gross negligence by misleading conduct that is tied to the unlawful practices under the New Jersey Patients' Rights law and other federal laws.

10. In Part 2, the amended complaint [ECF No.5] will be amended in this second amended complaint to best fit, in the Plaintiff's eye, the outcome of the Court's Order [ECF No. 35] with the intend not to affect the claim that is moving forward from the amended complaint [ECF No. 5].

11. Furthermore, the TBI-disabled, Pro Se, Plaintiff deficiencies for moderate to severe TBI are overcoming him as he writes this second amended complaint. He is doing his best event with this second extension of time.  The complexity of the claims has overwhelmed the Plaintiff cognitively as he fights cognitive exhaustion.  Due to this condition, the plaintiff may have to seek leave to provide the Court with addendums to this complaint that exhibits factual evidence.

**1.  PARTIES INVOLVED.**

12. Plaintiff:   Robert C. Dalton, an individual
99 Kennedy Blvd, Apt. 1
Bayonne, NJ 07002
Phone: 609-879-1050
Email: rca.dalton@gmail.com
[referred to herein as Plaintiff or TBI-Disabled Plaintiff]

13. Defendant 1:    Saint Barnabas Medical Center, a corporate entity,
                    (Currently known as Cooperman Barnabas Medical Center)
                    Richard Davis, President and CEO
                    94 Old Short Hills Rd.
                    Livingston, NJ 07039
                    Phone: 973-322-5000
                    www.rwjbh.org/cooperman-barnabas-medical-center/contact-us/)
                    [referred to herein as Corporate Defendant 1]

14. Defendant 2:    RWJBarnabas Health, a corporate entity,
                    Mark E. Manigan, President and CEO
                    95 Old Short Hill Rd.
                    West Orange, NJ 07052
                    Phone: 888-724-7123
                    www.rwjbh.org/contact-rwjbarnabas-health
                    [referred to herein as Corporate Defendant 2]

15. Defendant 3:    Rutgers University [Rutgers Health] , a corporate and vassal of the
                        State of New Jersey
                    Jonathan Holloway, President
                    7 College Avenue, 2nd Floor
                    New Brunswick, NJ 08901
                    Phone: 848-932-7454
                    (www.rutgers.edu)
                    [Referred to herein as Corporate Defendant 3]

16. Defendant 4:    Hackensack Meridian Health
                    Robert C. Garrett, CEO
                    343 Thornall St.,
                    Edison, NJ 08837
                    Phone: 844-464-9366
                    www.hackensackmeridianhealth.org
                    [Referred to Herein as Corporate Defendant 4]

17. Defendant 5:    HMH JFK University Medical Center
                    Amie Thornton, President and Chief Hospital Executive
                    65 James St
                    Edison, NJ 08820
                    Phone: 732-321-7000
                    [Referred to Herein as Corporate Defendant 5]

18. Defendant 6:    The State of New Jersey
                    c/o NJ Department of State
                    Tahesha Way, Secretary of State and Lt. Gov.
                    20 W. State St, 6th Flor
                    Trenton, NJ 08625.
                    Phone: 609-777-2581

www.nj.gov/state/
[Referred to Herein as either State Defendant 6 or Corporate Defendant 6]

19. Defendant 7:    Jonathan S. Holloway
                    Rutgers University
                    7 College Avenue, 2nd Floor
                    New Brunswick, NJ 08901
                    Phone: 848-932-7454
                    (www.rutgers.edu)
                    [Referred to Herein as Individual Defendant 1]

20. Defendant 8:    Brian L. Strom, Chancellor of Rutgers Biomedical and Health Sciences,
                    Executive Vice President for Health Affairs at Rutgers University, and
                    Administrator of Rutgers Health
                    Office of the Chancellor
                    Rutgers Health
                    Rutgers, The State University of New Jersey
                    Stanley S. Bergen Building
                    65 Bergen Street
                    Newark, NJ 07107
                    Phone: 973-972-4400
                    Email: chancellor@rbhs.rutgers.edu
                    www.rutgershealth.org/chancellor/contact-us

                    [Referred to Herein as Individual Defendant 2]

21. Defendant 9:    Andy Anderson
                    CEO of the Combined Medical Group of RWJBarnabas Health
                    Rutger University – Newark
                    195 University Ave
                    Newark, NJ 07102
                    Phone: 973-353-1766
                    [referred to herein as Individual Defendant 3]

22. Defendant 10:   Bill Troy,
                    Executive Director, Risk Management and Insurance
                    Rutgers University
                    University Finance and Administration, 2nd Floor
                    33 Knightsbridge Road
                    New Brunswick, NJ 08901
                    bill.troy@rutgers.edu
                    [Referred to Herein as Individual Defendant 4]

23. Defendant 11:   John Jay Hoffman
                    Senior Vice President and General Counsel
                    Rutgers, The State University of New Jersey
                    Liberty Plaza
                    335 George Street, Suite 2160

New Brunswick, NJ  08901
Tel:  848-932-7697
[Referred to Herein as Individual Defendant 5]

24. Defendant 12:  Robert C. Garrett, CEO
Hackensack Meridian Health
343 Thornall St.,
Edison, NJ 08837
Phone: 844-464-9366
www.hackensackmeridianhealth.org
[Referred to Herein as Individual Defendant 6]

25. Defendant 13:  Thomas Flynn, Senior Vice President, Chief Compliance Officer
Hackensack Meridian *Health*
343 Thornall Street, 8th Floor
Edison, NJ 08837
Phone: 551-996-4205
Email: thomas.flynn@hmhn.org
[Referred to Herein as Individual Defendant 7]

26. Defendant 14:  Amie Thornton, President and Chief Hospital Executive
HMH JFK University Medical Center
65 James St
Edison, NJ 08820
Phone: 732-321-7000
[Referred to Herein as Individual Defendant 8]

27. Defendant 15:  Mark E. Manigan, President and CEO
RWJBarnabas Health, a corporate entity,
95 Old Short Hill Rd.
West Orange, NJ 07052
Phone: 888-724-7123
www.rwjbh.org/contact-rwjbarnabas-health
[referred to herein as Individual Defendant 9]

28. Defendant 16:  Barry H. Ostrowsky
former President and CEO, RWJBarnabas Health, retired Dec. 2022
  Partner at St. Barnabas Corporation West Orange, NJ
95 Old Short Hills Road
West Orange, NJ 07052
[referred to herein as Individual Defendant 10]

29. Defendant 17:  Dr. Jamie M. Levine
HMH JFK University Medical Center
65 James Street
Edison, NJ 08820
Phone: 732-321-7000
www.doctors.hackensackmeridianhealth.org

[referred to herein as Individual Defendant 1]

2. BASIS FOR JURISDICTION

30. The basis for jurisdiction is a Federal Question. Moreover, Federal Questions. These federal questions pertain to the American with Disabilities Act Of 1990, as amended, the Rehabilitation Act of 1973, and other federal laws. Thus, the U.S. District Court; District of New Jersey, Newark Location has Original Jurisdiction and Subject Matter Jurisdiction. All Defendants conducted business in and the committed act occurred in the U.S. District Court; District of New Jersey; Newark Location.

31. Moreover, the damage exceeds the amount of $75,000.

32. The United States District Court; District of New Jersey, Newark location has subject matter, specific, and personal jurisdiction this matter. This civil matter arises out of Livingston, NJ.

33. Furthermore, the United States District Court; District of New Jersey has supplemental Jurisdiction in state law matters under 28 U.S. Code §1367(a). The U.S. District Court has original jurisdiction based on the Federal Question pertaining to the ADA, RE73, 42 U.S.C. §1983, and 42 U.S.C §1986. All claims arise out of common nucleus of operative fact. The New Jersey State law in question or the State Question is the New Jersey Patient's Bill of Rights, N.J. Admin. Code § 8:43G-4.1, parts (a)(3), (a)(17), (a)(18), (a)(27), and (a)(31).

34. Furthermore, the Plaintiff believes that the "Consent for Treatment" forms that were required to be treated at each visit for healthcare at all the Corporate Defendants healthcare facilities were unconscionable adhesion contracts having both procedural and substantive unconscionability that were required to be signed under duress, with intimidation, deception, impairment, obfuscation, and misleading statements, and without accessibility for the deficiencies related to the Plaintiff's disability.

3. MATTERS OF LAW

35. In the second amended complaint, the State of New Jersey is involved as well as the vassal of the state of New Jersey, Rutgers university, the State University of New Jersey.   State of New Jersey and Rutgers University established partnerships with hospitals in two different hospital systems, RWJ Barnabas health and Hackensack Meridian Health; Thereby exposing such relationships to be governed under Title II of the ADA as well as section 504 of the RE73 with respect to the U.S. Department of Justice, U.S. Department of Education and the U.S. Department of Health and Human Services.

36. Furthermore, Federal Statues that are matters of law in the second amended complaint are related to unlawful discrimination on the basis of disability regarding accessibility by the plaintiff's preferred method of effective communication using an auxiliary service, preferred method of effective communication using an auxiliary aid, information, and signage.

37. Furthermore, Federal Statues that are matters of law in the second amended complaint are related to unlawful discrimination, 29 U.S.C. §794, solely by reason of the Plaintiff's of disability regarding accessibility by the plaintiff's preferred method of effective communication, preferred method of effective communication using an auxiliary aid, information, and signage.

38. Furthermore, matters of law concern Federal Civil Rights Statures 42 U.S.C. §1981, 42 U.S.C. §1983 and 42 U.S.C. §1986 in relationship to State and Federal Statures.   Moreover, matters of Law concern New Jersey State Statute for the New Jersey Patients' Bill of Rights, N.J. Admin. Code §8:43G-4.1 parts (a)(3), (a)(17), (a)(18), (a)(27), and (a)(31).   Moreover, matters of law of concern in this relationship is 18 U.S.C. 1035 – False Statements

39. Matters of law relate to Federal ADA and RE73 regulations for unlawful discrimination regarding accessibility with communication.  These said Federal laws have regulation about accessibility based upon communication including effective communication, information, and signage. These regulations include 28 CFR 39.160 through 35.164, 45 CFR 92.102, 45 CFR 92.104, 28 CFR 35.134, 34 CFR 105.40, and 28 CFR 35.130.

4. COLLECTIVE REFERENCES FOR DEFENDANTS IN 2ND AMENDED COMPLAINT.

40.  Collectively, Defendants 1 through 16 are referred to hereinafter as "**the Corporate Defendants and leadership**".

41. Collectively, Individual Defendants 1 through 10 are referred to hereinafter as "**the Corporate Leadership**".

42. Collectively the Corporate Defendants 1 – 6 are referred to hereinafter as "**the Corporations**".

43. Collectively, Defendants 1 and 2 are the combined corporate defendants being St Barnabas Medical Center of the RWJBarnabas Health system and referred to hereinafter as "**stb/rwjb**".

44. Collectively, Defendants 2, 3, and 6 are the combined corporate defendants being Rutgers Health of the RWJBarnabas Health system and are referred to hereinafter as "**ru/rwjb**".

45. Collectively, Defendants 3, 4, 5, and 6 are the combined corporate defendants being HMH JFK University Medical Center partnered with Rutgers Health [Rutgers University and the State of NJ] of the Hackensack Meridian Health system and are referred to hereinafter as "**rujfk/hmh**".

46. Collectively, Defendants 2, 3, 6, 7, 8, 9, 10, 11, 15, and 16 are the Defendants consisting of the Corporate Defendants and leadership [individual defendants] for the Rutgers Health [Rutgers University and the State of NJ] and the RWJBarnabas Health System and are referred to hereinafter as "**L-ru/rwjb**".

47. Collectively, Defendants  3, 6, 7, 8, 9, 10, 11, 12, 13, and 14 are the Defendants consisting of the Corporate Defendants and leadership [individual defendants] for HMH JFK University Medical Center

partnered with Rutgers Health [Rutgers University and the State of NJ] and the Hackensack Meridian Health and are referred to hereinafter as L-rujfk/hmh.

48. Collectively, Defendants   3, 6, 7, 8, 9, 10 and 11 are the Defendants consisting of the Corporate Defendants and leadership [individual defendants] for Rutgers Health [Rutgers University and the State] and are referred to hereinafter as "**L-ru/state**".

49. Act that occurred earlier that the merger date of JFK Medical Center and Hackensack Meridian Health primarily deal with disability discrimination based upon disability regarding accessibility by denying the Plaintiff's referred method of effective communication using an auxiliary service, an email. This discrimination is under ADA Title II and RE73.  Additional claims are related to 42 U.S.C. 1981, 1983 and 1986 with regard to the New Jersey Patients Bill of Rights, N.J. Admin. Cod 8:43G-4.1 section (a)(3), (a)(18), (a)(27), and (a)(31). Collectively, Defendants 3, 5, 6, 7, 8, 9, 10, 11, and 14 are referred to herein as "rujfk".


5.  DISCUSSION ON COLLECTIVE REFERENCE WITH RESPECT TO THEIR FUNCTIONS AND LIABILITY

50. Collectively, Corporate Defendants are led by the Corporate Leadership [Individual Defendants] who are educated individuals with almost unlimited resource for access to attorneys, consultants, and other professionals that can meet their specific needs.  In some cases, the Corporate Leadership consists of an attorney.

51. The goals of any corporation including the Corporation are to maximize profit, manage risks, limit liabilities, and increase efficiencies of operations.  The Corporation's leading unpredictable expenses are most likely liabilities from possible malpractice lawsuits or settlements.  In order to limit the probability of a liability like malpractice, any corporation's CEO or president along with their board of directors will manage this liability risk.

52. In the opinion of the Plaintiff, the Plaintiff believes that the Corporations and their Leadership worked to undermine the civil rights of disabled individuals, like myself, to manage risk. This is evident in the nefarious summaries of the New Jersey Patient Bill of Rights, lack of staff training on disability rights, forming a culture a disrespect for a patient's civil rights, removing and replacing operative words in Federal and State laws to their purpose in summaries of disability and patents' rights for individual. The Corporations and their leadership use unconscionable adhesion contracts having both procedural and substantive unconscionability that required to be signed under duress, with intimidation, deception, impairment, obfuscation, and misleading statements, and without accessibility for the deficiencies related to the Plaintiff's disability. Furthermore, the Corporations and their leadership purposely created gray areas in their contracts and activities during their undermining of the disability rights so they can have plausible denial for their unlawful discrimination on the basis of disability and solely on the disability. Furthermore, the Corporations and their leadership created procedures that eliminated civil rights under the New Jersey Patients' Bill of Rights. Moreover, the Corporations and their leadership did not provide information and signage at the place of accessibility for the plaintiff's disability as per federal and state laws.

6. PLAINTIFF'S BACKGROUND IN CIVIL RIGHTS.

53. The Plaintiff has had awful experiences with the State of New Jersey with respect to Civil Rights.

54. The Plaintiff did not discover, realize, and understand that he had a moderate to severe traumatic brain injury until about 50 months after in 2012 injury. The State of New Jersey failed to inform him of why he was granted Medicaid for his disability. The rehabilitation facility told the Plaintiff that his back injuries were the main concern, and staff at the rehabilitation facility never discussed his TBI with him. Ultimately, the Plaintiff found out about his TBI sometime in 2016 through Ocean County Social Services. He was shown his PA-8 form that said that he was disabled with a TBI. [a form provided to

County Boards of Social Services that lists the person's disability].  By this time, the plaintiff was let go from two jobs. Then, his parents kicked him out of their home where he lived because they did not know that he had a TBI.

55.   The Plaintiff could not hold a job with his disability.   The first job severance was due to aphasia.  His contractual second job was not renewed. He experienced disability discrimination at his third job, and subsequently filed a complaint with the EEOC.  The EEOC issue charges for the unlawful discrimination based upon disability, and then TBI-disabled plaintiff settled in mediation.  During this third job, the plaintiff realized that he had a unique form of photophobia because prior to this job, he would experience strong changes in his moods including crying under certain sky and indoor light conditions.  The Plaintiff's photophobia has photo-endocrinology effects on him, and greatly degrades his executive functions due to exposure time to certain light conditions.  This is happened while he writing this 2nd amended complaint.

56. During the time with the EEOC incident, the plaintiff familiarized himself with the ADA; he discovered that he had a right to effective communication.  The plaintiff knew he had communication issues because at times when his executive functions decline there is always a cause for the decline.

57. The plaintiff had very serious problems filing for unemployment online in the State of Maryland in 2017.  The plaintiff could not express himself when he tried to write in a computer field of the online application.  The software program did not provide the number of characters limit in the field. Eventually, the plaintiff had to go to the Secretary of Labor's office in MD to find someone to assist him. He ended up in this office crying trying to explain what his difficulty was. The State of MD assigned Ms. Bown to assist; She help him talk out is issue and she solved the problem.  Later,  he was able to file for unemployment in March 2017.  This was the first time the Plaintiff exercised his civil right as he asked for an auxiliary service to assist him with his preferred method of effective communication.

58. Subsequently, the plaintiff began using his various preferred methods of effective communication to help with his disabilities deficiencies and improve his life.   The auxiliary service of being provided emails for communication with documents attached allowed him to have accessibility to enjoy the full benefits of cognitive therapy and other therapies to help him improve himself so he be accepted into Vocation Rehabilitation as his civil right under the Rehabilitation Act of 1973.

59. Effective communication was a major focus of his cognitive therapy to help him improve his abilities and offset his disabilities in deficiencies; and remains a major part of how the TBI-disable plaintiff manages his life. Emails play an essential role.  Communication by his preferred method of effective communication is an auxiliary service that he cannot live without at the present time, and he needs emails in communication to sustain his progressive recovery.

60. Emails communication reduces his depression and anxiety, because email reduces his anxiety and rumination.  Otherwise, the plaintiff's life is blogged down with rumination trying to remember commitments, expenditures, other paperwork leading to depression and anxiety that has taken him to a very dark place of memories with suicidal ideation; And his withdraws from society.

61. Furthermore, emails allow the Plaintiff to exercise his mind.   The email exchanges provide for repetition of subject matter so he can make connection to stored memories and properly encode his memories for later recall. While the plaintiff can be highly functional, his executive functions rapidly decline without his preferred methods of effective communication for his disability that are subject to surrounding conditions.


7. CLAIM SET 2:     RELATED TO UNLAWFUL DISCRIMINATION ON THE BASIS OF DISABILITY REGARDING ACCESSIBILITY BY DENYING THE PLAINTIFF'S REQUESTED PREFERRED METHOD OF EFFECTIVC COMMUNICATION: USING AN AUXILLARY AID.

62. The Plaintiff has two sets of Claims for unlawful discrimination on the basis of disability regarding accessibility by denying the plaintiff's request preferred method of effective communication: Using an Auxiliary Aid.

63. Claim Set 1 is the Claim set moving forward per the Court's Order [ECF No. 35]. Claim Set 1 is found in Part 2 of this second amended complaint as is discussed above.

7.1 Statement of Claim Set 2

64. Claim Set 2 differs substantially compared to Claim Set 1. Claim Set 2 is against Defendant 17 [Dr. Jamie Levine] and the Defendants that consist of collective defendants rujfk/hmh, Defendants 3, 6, 7, 8, 9, 10, 11, 12, 13, and 14. Since Rutgers University [Rutger Health] is part of the State of New Jersey, unlawful discrimination on the basis of disability regarding accessibility by denying the plaintiff's requested preferred method of effective communication [the auxiliary aid: using my phone to audio recorder to understand the doctor's diagnosis and answers to questions that I asked doctor regarding her diagnosis] is under both Title II of the ADA and the RE73. Since Rutger Health is both part of a college and a hospital, Rutger University [Rutgers Health] are bound, in addition to Department of Justice regulations, to regulations under the Department of Education and Department of Health and Human Services with regard to Section 504 of the RE73. This situation is confusing to the TBI-Disabled Plaintiff.

65. The Plaintiff is aware that respectfully the Court will judicate the count of claims for each Federal Laws and each regulatory body, and the Court will make the ultimate decisions on any multiplying affects due to appropriate regulations overlapped by multiple federal agencies . Therefore, the plaintiff's claims in Claim Set 2 are against each said defendant having multiple counts of four (4): one count under the ADA Tittle II, one count under RE73 from the U.S. Justice Department; one count under RE73 from the U.S. Department of Education; and one count under RE73 from the U.S. Department of Health and Human Services.

66. The Plaintiff scheduled an appointment with JFK Johnson Rehabilitation Institute to be treated after a rear end collision for his back pain and any concussion related symptoms or injuries. As per previous Court Filings, the Plaintiff was treated by Dr. Curato at St. Barnabas Medical Center immediately after the rear end collision approximately 3 months earlier.  During the accident, the Plaintiff sustained a concussive event and substantial back pain as reported.  The appointment was for June 6, 2019.

67. The plaintiff came to his visit and met with Dr. Levine.  Dr Levine began her initial intake of the Plaintiff's background.   The Plaintiff told the doctor that he had substantial pain in his back that prevented him from turning and twisting to regularly accomplish one or more activities of daily living (ADL's).  Defendant 17 said that she could not exam his pain because he was in concussion clinic.  The Plaintiff found the Defendant's response to be quite odd since Defendant 17 was a physiatrist, doctor who would take care of the Plaintiff's back pain.  The doctor told the Plaintiff that he had to make another appointment. So, the Plaintiff did.  Defendant's action violated the Plaintiff's rights under the N.J. Administrative Code 8:42G-41(a)(31).

68. After a bad night's sleep, running late to meet his appointment on Nov. 14 with Defendant 17  at JFK Johnson Rehabilitation Institute, and having a difficult 45 minute drive in light conditions affecting the Plaintiff, the Plaintiff arrive at HMH JFK University Medical Center.  Additionally, the Plaintiff arrived flustered and confused because he was ruminating after someone at HMK JFK University Medical Center called him at least a day earlier about his appointment.  For two years now, the Plaintiff has told all departments at this medical center where he is treated that his preferred method of effective communication is by email only; This was told to the staff at JFK-Johnson Rehabilitation Institute and should be in my files that they have.  Regardless, rujfk/HMH did not care and continued to unlawfully discriminate against the TBI-Disabled Plaintiff on the basis of disability regarding accessibility by denying the Plaintiff's preferred method of effective communication by using an auxiliary service, an email, for all

communication, too.   This unlawful discrimination on the basis of disability has been ongoing for years with deliberate indifference.

69. This Set of Claims has four counts against each defendant in Claim Set 2.  The four counts for each defendant, Defendant 17 and Defendants 3, 4, 5, 6, 7, 8, 9, 10, 11, 12, 13, and 14.

70. Subsequently, the Plaintiff went into an examining room and meet with the doctor.    The doctor badgered him about why he did not have his Neuropsychology evaluation done; The Plaintiff became more flustered because he was here to treat his back as the doctor told him to come back to be treated. Now the Plaintiff is here, and the doctor still refuses. The Plaintiff could not think straight.  He calmly asked the doctor if he could use his phone to audio tape her diagnosis and answer his questions about her diagnosis; Furthermore, the Plaintiff told the doctor that he was very confused, and he was exercising his preferred method of effective communication for the current situation and conditions which was using an auxiliary aid to help him remember and later understand the doctor's diagnosis and decisions.  Defendant 17 would not allow him to use his auxiliary aid, and she would not tell him why. The Plaintiff again requested his preferred method of effective communication.  Defendant 17 got very agitated and disrespectful to the Plaintiff, and then she got up from her desk, opened the door, and left the room waving her hands and arms over her head apparently mumbling to herself.  We were only a few minutes into my appointment.  I got up after a few seconds to find her.  Defendant 17 just disappeared.

71. Fortunately, there was someone in the waiting room who recognized me.  This person was from Jazzarah's Way.  She called out to me.  I did not recognize her because of my state of mind.  This person was someone that I knew from Congressional Brain Injury Awareness Day that is held in Washington , DC. I told her what happened.  She said that is very odd because she regularly asks for the same auxiliary aid when she meets Dr. Gries.  Dr. Gries is a well-known and respected doctor specializing in head injuries at the same department.  Dr. Gries complies; Dr. Gries knows the law.

72. Days later, I ordered Dr. Levine's note from my two medical exam meetings with her.  When I receive the notes, Like Dr. Curato in Claim Set 1, my medical records by Defendant 17 did contain all the truth.  In Defendants 17 notes, there was no mention of my back pain or my requests in Defendants 17's notes from my either of my two visits for back pain.

73. I never received the written explanation as to why I could not use by aid as required by Law, 28 CFR §35.164.  Therefore, Defendants 17 and rujfk/hmh defendants acted with deliberate indifference.

74. Therefore, the Plaintiff, who is known by Defendants 17,  3 ,4, 5,6 ,7, 8 , 9, 10,1 2, 13, and 14 to have a disability with physical and mental impairments , a TBI, that substantially limits one or more of his major life activities, was unlawfully discriminated against on the basis of disability regarding accessibility by said defendants denying the Plaintiff's preferred method of effective communication that is an auxiliary aid, an app in the Plaintiff's phone that audio records.

75. The said defendants unlawfully discriminated on the basis of disability against the Plaintiff regarding accessibility by denying the plaintiff's requested preferred method of effective communication.  The plaintiff's requested preferred method of effective communication was to use an auxiliary aid to assist him to understand and remember what his diagnosis was and the answers to questions he had for the doctor.   The Defendants denied the plaintiff his request and was harmed.  The Plaintiff remained in pain until he was treated by Dr. Luo many months later.  Additionally, the Defendants unlawful discrimination added to the emotional and psychological harm that was done to the Plaintiff by Dr. Curato causing more depression and anxiety, especially about got to see a doctor to get medical treatment so he can get to NJDVRS, vocational rehabilitation.

76. Furthermore, the said defendants acted with deliberate indifference because they never complied with the law when they did not send the Plaintiff a written reason for denying the plaintiff's request as required by law.

8.  CLAIM SET 3.  CLAIMS RELATED TO 42 USC §1983 AND 42 USC §1986 REGARDING DENIAL OF CIVIL RIGHTS AND CONSPIRACY TO DEPRIVE CIVIL RIGHTS, RESPECTFULLY. THE PLAINTIFF'S RIGHTS UNDER THE N.J. PATIENTS BILL OF RIGHTS , NJ ADMIN. CODE § 8:43G-4.1 (a)(31)

77. N.J. Admin. Code §8:43G-4.1(a) (31) reads as follows:

(a) Every New Jersey Hospital Patient shall have the following rights, none of which shall be abridged by the hospital or any of its staff. The Hospital administrator shall be responsible for developing and implementing policies to protect patient rights and to respond to questions and grievances pertaining to patient rights. The rights shall include at least the following:

31. to expect and receive the appropriate assessment, management and treatment of pain as an integral component of that person's care, in accordance with N.J.A.C. §8:43E-6.

8.2 STATEMENT OF CLAIM SET 3 RELATED TO 42 U.S.C. §1983

78. The plaintiff was deprived of his civil rights by Defendants 3 through 14 and Defendant 17 when said defendants refused to examine and treat the Plaintiff's pain during his June 6, 2019, appointment at JFK -Johnson Rehabilitation Institute.  Defendant 17, Dr. Levine, refuse to examine and treat the Plaintiffs pain.  Defendant 17 said she was in "concussion clinic", and Dr. Levine said that she was not allowed to examine the Plaintiff because of the rules of a program called "concussion clinic" established by said defendants.

79. Based upon the information above, the said defendants unlawfully deprived the Plaintiff of his civil rights under the Plaintiff right under the New Jersey Law, N.J. Admin. Code §8:42G-4.1(a)(31): New Jersey Patients' Bill of Rights.  The Defendants actions intentionally deprived the Plaintiff's civil right to expect and receive appropriate assessment, management, and treatment of pain as an integral component of the plaintiff's Care in accordance with N.J.A.C 8:42e-G.  The plaintiff was injury and harmed by their action.

80. One count of this claim of Claim Set 3 is against each Defendant 3 through 14 and Defendant 17 for their action on June 6, 2019

81. A similar situation by the same said defendants occurred on November 10, 2019. The actions are described above Section 7.

82. Therefore, the Plaintiff has another count of this claim of Claim Set 3 that is against each Defendant 3 through 14 and Defendant 17 for their action on November 14, 2019

83. Therefore, there are two counts of 42 USC §1983 against each said defendants 2-14 and Defendant 17.

8.2 STATEMENT OF CLAIM SET 3 RELATED TO 42 U.S.C. §1986 (3)DEPRIVING PERSONS OF RIGHTS OR PRIVILEGES

84. The plaintiff was subject to a conspiracy to deprived of the Plaintiff of his civil rights by Defendants 3 though 14 and Defendant 17 when said defends refused to examine and treat the Plaintiff's pain during his June 6, 2019 appointment at JFK -Johnson Rehabilitation Institute causing the Plaintiff injury and harm.  Defendant 17, Dr. Levine, refused to examine and treat the Plaintiffs pain. Defendant 17 said she was in "concussion clinic", and Dr. Levine was not allowed to examine the Plaintiff because of the rules of a program called "concussion clinic".  The Concussion Clinic was established by said defendants who conspired to unlawfully deprive the Plaintiff of his New Jersey Patients' Rights under N.J.A.C 8:43G-4.1 (a)(31).

85. Based on the information above, the said defendants unlawfully conspired to deprive the Plaintiff of his civil rights under the Plaintiff right under the New Jersey Law, N.J. Admin. Code §8:42G-4.1(a)(31): New Jersey Patients' Bill of Rights.  The Defendants' conspired to intentionally unlawfully deprived the Plaintiff's civil right to expect and receive appropriate assessment, management, and treatment of the Plaintiff's pain as an integral component of the plaintiff's care in accordance with N.J.A.C 8:42e-G

86. The said defendants conspired to unlawfully deprive the Plaintiff of his rights under said NJ law on two occasions:  One occasion was on June 6, 2019 and the other occasion was on November 14, 2019

87. One count of this claim of Claim Set 3 is against each Defendant 3 through 14 and Defendant 17 for their action on June 6, 2019

88. A similar situation by the same said defendants occurred on November 14, 2019. The actions are described above Section 7.

89. Therefore, the Plaintiff has another count of this claim of Claim Set 3 that is against each Defendant 3 through 14 and Defendant 17 for their action on November 14, 2019

90. Therefore, there are two counts of 42 USC §1983 against each said defendants 3-14 and Defendant 17.


9. CLAIM SET 4.    CLAIMS RELATED TO RELATED TO UNLAWFUL DISCRIMINATION ON THE BASIS OF DISABILITY REGARDING ACCESSIBILITY BY DENYING THE PLAINTIFF'S REQUESTED PREFERRED METHOD OF EFFECTIVC COMMUNICATION USING AN AUXILLARY SERVICE. THE AUXILLIARY SERVICE IS COMMUNICATION BY EMAIL ONLY.

91. For many years the Plaintiff has requested an auxiliary service for effective communication for his disability. The auxiliary service is communication by email only.  Of course, the activity of a telehealth appointment is exempt from this request for obvious reasons.

92. Claim Set 4 is claims against Defendants 2, 3, 6, 7, 8, 9, 10, 11, 15, and 16.  The defendants consist of RWJBarnabas, the leadership of RWJBarnabas, Rutgers University, the State of New Jersey, and individuals who are a team of leaders at Rutgers University.   Rutger Health is a part of the RWJBarnabas Health system and is part of Rutgers, the State University of New Jersey.  Hence, Rutgers University and the State of New Jersey are the defendants for Rutgers Health.

93. Similar to Claim Set 2, the laws that apply to this type of discrimination is ADA Title II and RE73. Since Rutgers Health is both part of a college and is a hospital more than one U.S. Department's Regulations apply to the RE73; These departments are the U.S. Department of Education, U.S.

Department of Health and Human Services, and the U.S. Justice Department. So, for each count under the RE73 there exist three counts: One count for the U.S. Justice Department, one count for the U.S. Department of Education, and the U.S. Department of Health and Human Services.

94. At the moment the Plaintiff's disability has limited his scope of his claims due his energy levels and cognitive overload. All Defendants, except Defendants 1 and 17 have repeatedly unlawfully discriminated against the Plaintiff on the basis of disability regarding the accessibility by denying The Plaintiff his preferred method of effective communication using an auxiliary service: communicating only by email.

95. The Plaintiff has counted at least 100 times this has occurred but he has had great trouble compiling all the information to effective organize this information to make an understandable expression of all this event. This is because all the said defendants refuse to provide the Plaintiff preferred method of effective communication, an email. This has gone on for years. The defendants have even emailed him several times to tell the Plaintiff that they cannot or are not allowed to email him. This is very strange. To compile all the information the plaintiff has to go to several resources to gather data instead of one source: his email program. The Plaintiff did not have time to do this because he and to learn how to use software that was not intuitive to him causing him great duress and requiring The plaintiff to use all the limited energy that he has. All the defendant realize that the TBI-disabled Plaintiff has problems with his low energy level.

Statement of Claim Set 4.    CLAIMS RELATED TO RELATED TO UNLAWFUL DISCRIMINATION ON THE BASIS OF DISABILITY REGARDING ACCESSIBILITY BY DENYING THE PLAINTIFF'S REQUESTED PREFERRED METHOD OF EFFECTIVC COMMUNICATION USING AN AUXILLARY SERVICE. THE AUXILLIARY SERVICE IS COMMUNICATION BY EMAIL ONLY.

96. The Claim Set 4 contains two claims as mentioned in the Court's Order [ECF 35]. Each claim has a count under the ADA Title II and Section 504 of RE73. There are three U.S. agencies that regulate the

defendants under Section 504 as discuss herein.  So, each Claim will have four counts associated with the Claim 1 of Claim Set 4: One Count under ADA Title II and three counts under the RE73.

97. The Plaintiff began going to Rutgers Health's department of endocrinology approximately in late Aug or Sept of 2020.  The pandemic was ongoing.  Telehealth appointments were quite common at this time.  The Plaintiff requested his preferred method of effective communication to be by email. At the time the Staff was sending the Plaintiff links to telehealth on his phone by text message.  At the time , the Plaintiff was living in little Egg harbor, nj at his dad's home.  The house is on a water way and has all windows basically for walls that cause a tremendous amount of glare that is difficult to stop. Moreover, the Plaintiff phone has poor connectivity to the cell towers where he lives so the reception is very poor. Additionally, his phone has a shiny screen as most smart phones do.

98. At home for video conferencing the Plaintiff has purchased a computer with a low glare screen that work off the Plaintiff internet service at home.  The Plaintiff needed to be emailed links to the video service in use by Rutgers Health.

99. The Plaintiff failed to receive the links by email from September 2020 through December 2020. The Plaintiff complained but did not receive emails by the staff that he could reply to incase of not being able to make a telehealth appoint and keep records of the Plaintiff activity.  Staff members informed the plaintiff that they were not allowed to send emails, and the informed me about this by email.

100. The Plaintiff is a disabled individual with disability having physical and mental deficiencies that limit one or more of his life's activities. The Plaintiff requested his preferred method of effective communication to Rutgers Health staff at said department, and they fail to provide the Plaintiff with his preferred method of effective communication.  The staff gave him no written reason as to why they could not provide the plaintiff with his preferred method of effective communication that was an auxiliary service: communicating with the plaintiff by email.  The plaintiff has many records of this attempt to get his preferred method of effective communication with avail.  These actions occurred

around Sept through December 2020. Despite the Plaintiff complaining, this issue was not resolved at an appropriate time. Furthermore, the plaintiff did not receive a written notice as required by law; Hence the said plaintiff acted with deliberate indifference.

101. The claim has one count under Title II of the ADA and three counts under the RE73 for each defendant.


State of Claim 2 of Claim Set 4:

102. Claim 2 is similar to Claim 1 of Claim Set 4. From January 1, 2020 to May 15, 2020, the same behavior by the same said defendants above continued. The Plaintiff repeatedly told said staff at said department as Rutger Health that is preferred method of effective communication was to have all communication by email. Instead, the plaintiff would receive "no reply" emails. This is not a two way communication means. The said defendants continued to ignore the Plaintiff's preferred method of effective communication.

103. The Plaintiff continued to complain to Staff. See Exhibit 300 for the said defendants' reply.

104. This reply was never followed-up by the appropriate staff as said in Exhibit 300. No written notice was received by the Plaintiff as is required by law.

105. Defendants 2, 3, 6, 7,8,9,10, 11, 15 and 16 unlawfully discriminated on the basis disability against the TBI-disabled Plaintiff regarding accessibility by denying the plaintiff preferred method of effective communication, an auxiliary service. The auxiliary service was all communication by email. The said defendants ignored the plaintiff even after constant complaining. No written notice was given to the Plaintiff as required by law.

106. The second claim of claim set 4 has one count under the ADA Title II and three counts under the RE73 for each said defendant.

Disclosure: The plaintiff experienced cognitive overload and cognitive exhaustion and a new photophobia that basically froze his thought where it took him about two and half days just to type in the information about the 17 defendants.  The Plaintiff was not about to compile all of the remain over 100 act of this type of unlawful discrimination on the basis of disability for all the defendants especially Rutgers Health and HMH JFK University Medical Center.

PART TWO



UNITED STATE DISTRICT COUT;

DISTRICT OF NEW JERSEY; NEWARK LOCATION          Case #: 2:21-CV-05354-CCC-ESK

ROBERT C. DALTON, an individual          Civil Action

     The Plaintiff

v.

                              March 15, 2021

Saint Barnabas Medical Center, a corporate entity,

RWJBarnabas Health, a corporate entity,

NICOLE CENTRELLA, an individual, and

Dr. Jane Doe Lauren J. Curato, Individual.

     The Defendants

AMENDED COMPLAINT

Civil Action:  Civil Lawsuit for Civil Rights Violation involving Discrimination on the Basis of the
Plaintiff's Disability by the DEFENDANTS and the DEFENDANTS Denying the Plaintiff his Civil
Rights regarding The Plaintiff's Preferred Method of Effective Communication for the
Plaintiff's Disability Under the Americans with Disabilities Act (ADA), as amended, and the
Rehabilitation Act of 1973, as amended, .  Additionally, this Civil Lawsuit is for Fraudulent
Representation with regards to 42 CFR § 482.24 condition of participation: Medical Records
Services. The Plaintiff Seeks Damages totaling $25,000,000.00 plus legal fees and other
related compensation for these civil rights violations and related harm and injury.

### i. Preface

1. The TBI-disabled Plaintiff requests that the Court note that the Plaintiff is medically document with afflictions having several long-term and permanent deficiencies. These deficiencies are due to a moderate to severe traumatic brain injury (TBI) that occurred in 2012, and then these deficiencies were exacerbated with two subsequent concussive events: one in 2017 and another in 2019. The TBI-disabled Plaintiff has expression difficulties, various executive function deficiencies, photophobias related to light wavelength and intensity photophobias, phonophobia, depressed energy levels, and other. The TBI-disabled Plaintiff is documented with aphasia and tangential, circumstantial (circumstantial meaning "*of description containing full details*'), and verbose communications.

2. The Plaintiff humbly request that the Court consider the Plaintiff's disabilities during the proceeding of this civil action. Often the Plaintiff needs more time complete tasks and has difficulty expression himself.

### ~~1. Parties Involved~~

~~3. Plaintiff:    Robert C. Dalton, an individual~~
~~24 Maryland Rd~~
~~Little Egg Harbor Twp., NJ 08087~~
~~Phone: 609-879-1797~~
~~Email: rca.dalton@gmail.com~~
~~[referred to herein as the "Plaintiff" or "TBI-Disabled Plaintiff"]~~

~~4. Defendant 1:    Saint Barnabas Medical Center, a corporate entity,~~
~~Stephen P. Zieniewicz, President and CEO~~
~~94 Old Short Hills Rd.~~
~~Livingston, NJ 07039~~
~~Phone: 973-322-5000~~
~~www.rwjbh.org/saint-barnabas-medical-center/contact-us/~~
~~[referred to herein also as "corporate defendant 1"]~~



5. Defendant 2:     RWJBarnabas Health, a corporate entity
                    Barry H. Ostrowsky, President and CEO
                    95 Old Short Hill Rd.
                    West Orange, NJ 07052
                    Phone: 888-724-7123
                    www.rwjbh.org/contact-rwjbarnabas-health/
                    [referred to herein also as "corporate defendant 2"]

6. Defendant 3:     Nicole Centrella, an individual
                    94 Old Short Hills Rd.
                    Livingston, NJ 07039
                    Phone: 973-322-500
                    www.rwjbh.org/saint-barnabas-medical-center/contact-us/
                    [referred to herein also as "individual 1"]

7. Defendant 4:     Dr. Jane Doe, Dr. Lauren J. Curato, an individual
                    (Dr. Jane Doe was the Head of the Emergency Room (ER)
                    at the time of my visit to the ER)
                    94 Old Short Hills Rd.
                    Livingston, NJ 07039
                    Phone: 973-322-500
                    www.rwjbh.org/saint-barnabas-medical-center/contact-us/
                    [referred to herein also  as "individual 2"]

8. Collectively, corporate defendant 1, corporate defendant 2, individual 1, and

individual 2 are referred to herein as the "DEFENDANTS".


2.  Basic for Jurisdiction

9. The basis for Jurisdiction is a Federal Question pertaining to the Americans with

Disabilities Act (ADA), as amended.  More specifically, Title III of the ADA, as amended

pertaining to the effective communication.  And, Section 504 of the Rehabilitation Act of 1973,

as amended, regarding effective communication.

10. Moreover, the Plaintiff's civil rights of due process and equal protection under the law under the 14th Amendment and due process under the 5th Amendment were violated by the Defendants.

11. Furthermore, the basis for Jurisdiction 29 USC §794 Non-discrimination under Federal Grant and programs. More specifically, corporate entity 1 and corporate entity 2 is subject to 29 U.S. Code 794 (b)(3)(A)(ii) since these state corporate entities are principally engaged in the business of health care.

12. The United States District Court: District of New Jersey; Newark location has subjected matter, specific and personal jurisdiction in this matter. This civil action arises out of action in Livingston, New Jersey.

13. Moreover, the damage exceeds the about of $75,000.00

3. Matters of Law

14. The *pro se* TBI disabled Plaintiff refers to the document on Effective Communication from the Disability Rights Section of the Civil Rights Division of the United States Department of Justice Document that is found in Appendix A for references to the matters of law.

15. The Plaintiff believes the matters of law pertain to Titles II and III of the Americans with Disability Act (ADA), as amend, and this law is believed to be 42 U.S. Code; Chapter 126 Equal Opportunity for Individual with Disabilities. More, specifically to law and regulations under this ADA for "effective communication" and "communication", Furthermore, the TBI disabled Plaintiff believes that the matters of law pertain to The Rehabilitation Act of 1973, as amended, and this law is believed to be 29 U.S. Code Chapter 16 — Vocational Rehabilitation

~~and Other Rehabilitation Service inclusive of 29 USC 794, Nondiscrimination under Federal~~

~~grants and program and other related laws and regulation regarding "effective communication"~~

~~and "communication" under this Chapter.~~

~~16. Additionally, the matter of law relates to Fraudulent Representation by the all~~

~~Defendants with regard to 42 CFR § 482.24 Condition of participation: Medical records services.~~

~~More specifically, the matter of law relates to 42 CFR § 482.2 (b) Standard; Form and Retention~~

~~of record, 42 CFR § 482.2 (c)Standard: Content of record, 42 CFR § 482.2 (c)(4)(iii), and 42 CFR §~~

~~482.2 (c)(4)(vi).~~

**4. Statement of Claim: Preferred Method of Effective Communication.**

17. Corporate defendant 1 is part of corporate defendant 2's healthcare system.

18. Defendant 3 is believed to be the nurse practitioner who provided medical attention

to the Plaintiff and who denied the TBI-disabled plaintiff's requested preferred method of

effective communication. Thus, defendant 3 violated the civil rights of the TBI-disabled

plaintiff.

19. Defendant 4 is director/head doctor of the ER who also denied the TBI-disabled

Plaintiff's repeated request for his preferred method of effective communication and who put

the non-violent, non-aggressive Plaintiff under armed guard in a private room. (Prior to being

under armed guard, the Plaintiff made multiple requested to defendants 3 and 4 to change

location for examination and waiting inside the ER due to his phonophobia. The TBI-disabled

Plaintiff's requests to be removed to an area that was much more quieter compared to the ER

were refused multiple times by defendant 3 and 4. Moreover, the local noise in the ER was

exacerbated the Plaintiff's decline in executive function on top of the decline in the Plaintiff's

executive functions due the accident; The emergency room environment had too much noise and distractions for the plaintiff causing more confusion, forgetfulness, and decline in executive functions in the TBI-disabled Plaintiff, and then the Plaintiff's confusion, forgetfulness and decline in executive functions were being worsened by the agitation being cause the rapid, illogical banter from defendants 3 and 4 as they refused the Plaintiff's requests for accommodation and his preferred method of communication.)

20. The TBI-disabled Plaintiff was disabled with a traumatic brain injury and made all the staff that he encountered at Saint Barnabas Medical Center aware that he was disabled with complications due to a moderate to severe traumatic brain injury. The DEFENDANTS operation was a place of public accommodation. The TBI-disable Plaintiff was denied his public accommodation of his preferred method of effective communication due to his disability [The Court should note that Saint Barnabas Medical Center regularly accommodates people with other disabilities as even stated on their website; However, Saint Barnabas Medical Center did not accommodate preferred effective communication for the Plaintiff's disability, a traumatic brain injury].

21. The TBI-disabled Plaintiff has a medically established disability. The Plaintiff's disability was known to the Defendants. The Plaintiff requested accommodation for his disability so the Plaintiff and benefit of a service with equal opportunity as people without the Plaintiff's disability. The DEFENDANTS repeatedly denied the TBI-disables Plaintiff's requested accommodation for his disability. The DEFENDANTS discriminated against the Plaintiff on the Basis of the Plaintiff's disability

22. The TBI-Plaintiff has a disability.  The Plaintiff's disability has a communication and expression disability that affects the Plaintiff's executive functions.  These aspects of the Plaintiff's disability were made know to the DEFENDANTS.  The Plaintiff's requested accommodations for his disability.  The Plaintiff repeatedly requested that the DEFENDEDANTS provide the Plaintiff's preferred method of effective communication for his disability and the current situation.  The DEFENDANTS repeatedly denied the Plaintiff's requests for his preferred method of effective communication.  The DEFENDANTS refused to provide the Plaintiff with an alternative to his requested preferred method of communication that was as effective in communication for the situation at hand as the Plaintiff requested.  The DEFENDENTS refused and failed to provide the Plaintiff with an explanation regarding how and why the Plaintiff's repeatedly requested preferred method for effective communication for the situation was an undue burden financially for the DEFENDANTS.  The DEFENDENTS refused and failed to provide the Plaintiff with an explanation regarding how and why the Plaintiff's repeatedly requested preferred method for effective communication for the situation was an undue burden administratively for the DEFENDANTS.  The DEFENDANTS refused and failed to provide the Plaintiff with an explanation on how and why the Plaintiff's requested preferred method of effective communication would fundamentally alter the nature of the DEFENDANTS program and/or activities at hand.

23.  Furthermore, with deliberate indifference, the DEFENDANTS refused and failed to provide the Plaintiff with a written statement by an individual with the  proper authority to provide the Plaintiff with such written statement as to how and why the Plaintiff's requested preferred method of effective communication would fundamentally alter the a nature of the

program and or activity, how and why this request would be a undue financial burden upon the

DEFENDANTS, and/or how and why this request would be and undue administrative burden

upon the DEFENDENTS. Furthermore, with deliberate indifference, the DEFENDANTS refused

and failed to provide the Plaintiff with a written statement by an individual with the  proper

authority stating to the Plaintiff an alternative method of effective communication that would

be as effective as the Plaintiff's requested method of effective communication for his disability

in the current situation and that would be as effective as would be for individuals without the

Plaintiff's disability and aspects of his disability. or activity, how and why this request would be

a undue financial burden upon the DEFENDANTS, and/or how and why this request would be

and undue administrative burden upon the DEFENDENTS.  Furthermore,  no written statement

on this matter was provided by the DEFENDANTS.

24. During the afternoon on March ~~14~~ 15, 2021, the TBI-disabled Plaintiff was traveling

to the West Orange, NJ campus to the Kessler Institute for Rehabilitation for a scheduled

session for ongoing research in brain injuries by Kessler, when the TBI-disabled Plaintiff was in a

car accident.  The other drive fails to stop her car in time, and subsequently the other driver's

car hit the Plaintiff's car from behind.  See Exhibit 1 for details of car accident.

25. Emergency and traffic safety personnel arrived on the scene.

26. The TBI-disabled plaintiff was offered an ambulance to a hospital.  Despite being a

bit confused and disorientated, the TBI-Plaintiff elected to drive his car to the nearest hospital

with the aid of GPS on the phone.  The Plaintiff had a difficult decision to make, because of his

dire financial position.  Had the Plaintiff took an ambulance to hospital, the Plaintiff could not

afford to get his car out of the impoundment, pay for towing, and/or pay for a taxi to take him

100 miles to the Plaintiff home.  The Plaintiff's car was drivable, and the authorities onsite at the accident allowed the Plaintiff to drive to the hospital.

27. The Plaintiff reported to the authorities on the seen about back pain in the up and down the spine and a bit of disorientation.

28. The Plaintiff arrived at the ER of Saint Barnabas Medical Center in Livingston, NJ. During the admittance, the Plaintiff disclosed to the admitting staff that he was disabled from a moderate to severe TBI in 2012, and the current accident was causing him much pain in his back at the mid-spine with some discomfort in his neck as well as being a bit out of sorts mentally with from the impact. After being admitted and sent to the waiting area, the Plaintiff was called into the ER for examination and any medical treatment.

29. The TBI-disabled Plaintiff was seated alone in a small private area that was surrounded by curtains where he was out of view from others and others were out of view from him.  The noise and distractions began to bother and agitate the plaintiff making the Plaintiff a bit confused.  A healthcare provider came into the area to examine the Plaintiff.

30. The Plaintiff was initially examined by defendant 3.

31. The Plaintiff became confused by the questioning of the examiner and the examiner's answers when the Plaintiff complained about the large amount of pain in his mid-back and neck discomfort.  The defendant 3 explained to defendant 3 that his back hurt where previous facture damage to his transverse, spinous, and other processes of his spine after his TBI-disabling accident where he was thrown from his car in 2012.  Defendant 3 refuse to do any imaging.  The Plaintiff repeatedly complained to Defendant 3 as he became more confused. Next, the Plaintiff request that defendant 3 provided the TBI-disable plaintiff  his preferred

method of communication that was to record the verbal information that defendant 3 was providing for treating and why. [The plaintiff had a good understanding of HIPPA requirements and his rights as well as others right under HIPPA. Also, the Plaintiff understood his civil rights under the ADA, as amended, and the Rehabilitation Act of 1973, as amended [especially after being disabled by a traumatic brain injury as well as State and Federal law for recording conversations. The plaintiff had been employed by a healthcare insurance company, medical supply companies and had been a pharmaceutical sample representative]

32. Defendant 3 repeated refused to provide the Plaintiff with is preferred method of effective communications. The noise from the error and the rapid, illogical banter from Defendant 3 was making the Plaintiff more confused as the TBI-disabled Plaintiff was becoming aware that his executive functions were declining as the TBI-disabled Plaintiff was aware that he was starting to have aphasia and more confusion. The Plaintiff continue to state his concern and request for his preferred method of communication that to tape what Defendant 3 was informing him regarding the state of his injuries; the Plaintiff was having trouble understanding logic of Defendant 3 in the face of his mid-back and neck pain and stiffness.

33. The Plaintiff had great concerns about possible damage to his neck's nervous system and his mid-back after this recent concussive impact; the Plaintiff was keenly aware that concussive events post an initial traumatic brain injury typically cause great deficiencies in executive functions, energy, and mobility – this is well-note by the TBI-disabled plaintiff from expert healthcare provide with specialty in brain injuries.

34. Defendant 3 continue to refuse the Plaintiff preferred method of effective communication and his request of imaging of his neck and mid-back because of the pain [the

neck is where a nerve system is located]. At this point, the noise in the ER was overwhelming the Plaintiff, and this noise continued to agitate the Plaintiff and causing his executive function to decline.

35. Next, the Plaintiff ask defendant 3 repeated to be move to a quieter location, his preferred method of communication, and for imaging of his neck and mid-back, but defendant 3 continued to refuse al of the Plaintiff's requests. Next, the Plaintiff request to speak with a doctor because Defendant 3 was a nurse practitioner. Defendant 3 went and got a superior who was a doctor and the present head of the ER, defendant 4, to talk to the Plaintiff.

36. Once again, the TBI-disable Plaintiff repeatedly pleaded, as a gentleman, to accommodate the plaintiff's requests with Defendant 3 and 4. The requests were 1) to be move to a quieter location so the ER noise would not continue to agitate the plaintiff and continue the decline in his executive function including confusion, aphasia, holding thought, etc., 2) to allow the TBI-disabled plaintiff to use his phone to record the audio of the medical information and answers being spoken by defendants 3 and 4 to the Plaintiff's questions about his medical condition, his pain, etc.; the plaintiff requested this preferred method of communication of recording because of the decline in his executive functions, and 3) imaging of his mid-back and neck. Defendant 4 said that she would find an accommodation for the noise and provide me imaging of my lower back and neck. Then, I asked for imaging where my pain actually was, my mid-back.

37. Again, asked for the area where my pain was radiating from in my mid-back to be imaged, and Defendant 4 said, "ok". Next, defendant 4 left the area to find a place for me

without noise.  Defendant 3 told me that I was going to  have my mid-back x-rayed. Next, I left for x-ray, and when I was leaving the area to get the x-rays.

38. When I got to the x-ray room, I asked the x-ray technician who was operating the machine, if there was an order for x-rays of my mid-back.  He said, "no".

39. After the x-rays were completed, I was taken to a private examination room in the ER having solid walls all around with a door to the hallway.  Next, the defendant 4 and an armed security guard came in the room with his hand resting on his holstered gun.  Again, I made requests that were not yet provided to me: a) I  formed defendant 4 that I needed to record the information medical information that she was telling me and the answers to my questions because I did not understand why she was not providing me with imaging of my lower back, but not where I had much pain; my mid-back, the place that was previously injured. Furthermore, at this time, my executive functions were declining again from the anxiety of having an arm guard with his had resting on his holster gun where the handle to his pistol was (referred to herein as individual 50.  Furthermore, I was still confused about the medical information that was being provide to me by defendant 4.; and b) once again, I asked defendant 4 for imaging of my mid-back where my pain was.  I receive a "weird answer" without an explanation from Defendant 4, then she left.

40. Defendant 4's weird answer about imaging was "the artificial intelligence software told her only to image my lower back".  No further explanation was provided to me.  I remained in the room with individual 5, the armed security guy.  The cost for the x-ray of my back is estimated, based upon the cost the x-ray of my lower back, to be $59 (fifty-nine dollars); besides I was already in the x-ray room and on the table for the x-ray machine.

41. After defendant 4 left this private room, I was alone being very anxious and nervous with individual 5 with his arm resting upon his holstered guy. I told individual 5 that I have not been here to cause trouble, and I have no plans to cause trouble. I will resolve this issue after I leave the facility by legal means. Soon after the emotional dysregulation became exacerbated from this auto accident, and I began to get emotional, crying.

42. Individual 5 was nice to me and even got me tissues to wipe my tears. I told individual 5 that because of my traumatic brain injury, at times, I have emotional dysregulation as I did at that moment. He understood this. He said to me that he had a friend with a brain injury that has similar, non-violent, emotional dysregulation. After some time, another female staff member came in the room. She held of one page of paper and offered me a pen. As she offered me the pen, she told if I signed this line on the paper, then I can leave. I took the pen, and then she pointed to the line where I was to sign if I wanted to leave. I signed the line on the one page, and she took the one page from. Then, she handed me a bunch of papers. Soon afterwards, I realize she pulled a bait and switch maneuver on me, a TBI-disabled individual who just a few hours ago had a concussive event causing confusion and a decline in his executive functions and who was still in pain in his mid-back and discomfort in his neck.

43. Next, I was escorted out of the facility by the armed guard, and then taken to my car by a coworker in security in his car. My phone's GPS guided my home.

44. During my visit, the DEFENDANTS never claimed any undue financial, administrative, or operational burdens to my requested preferred method of effective communication. Furthermore, the DEFENDANTS acted with deliberate indifference to my requested preferred method of effective communication; I was provided neither any explanation nor a valid

explanation as to why my preferred method of communication was denied. Furthermore, I was never provided an alternative effective communication by the DEFENDANTS to my preferred method of effective communication that was as effective as my requested preferred method of effective communication. I never received a prompt and written explanation from the DEFENDANTS as to why and what the undue burden was for providing me with my preferred method of effective communication. I was harmed, injured, suffered mental and emotional distress; I suffered statue violations of civil rights by the DEFENDANTS.

45. For over one year I suffered from an inability to perform several of my "activities of daily living (ADL's)" regularly until I receive proper treatment, physical therapy and medication, for my mid-back pain and lack of range of motion from Doctor B.; my quality of life and ability to go back to work suffered greatly; I am still out-of-work due partially due to back pain and other traumatic brain injury issues that were exacerbated by this accident. I was in constant pain and had a lack of range-of-motion until the physical therapy was over. Previously, I had tried other doctors for my back pains at another hospital system, hospital system B that specialized in head injuries and where my neurologist is located. The DEFENDANTS actions caused issues at hospital system B with Doctor A. Doctor A refused to treat my still occurring pain and stiffness in my mid-back as there was no medical reference to my mid-back pain from the accident; Instead, I was repeatedly instructed to see a neuropsychologist for an examination by Doctor A at hospital system B. Eventually, I was able to find Doctor B upon recommendations from another doctor and a therapist in Doctor B's medical organization, medical organization A. Doctor B determine that the injuries to my mid-back were from this auto accident that is discussed in this civil action.

46.  Prior to and afterward, I had used my preferred method of communication for various situations without much difficulty occurring regularly, but some difficulty somewhat uncommon occasionally.  Usually, such effective communication issues are corrected at a reasonable time that does not interfere with my understanding of my medical treatments and answers to my medical questions.

47. For example, when my preferred method of communication is the need to record medical information and answers to my questions, Doctor B at the Kessler Institute for Rehabilitation has an uncomplicated way of accommodating my request for preferred communication of recording as Kessler regularly does for other patients who makes the same type of preferred method of effective communication requested.  When I asked Dr. B to allow me to record him, his method is to let him do the examination first. When his examination is complete, he allows his patient to record his findings and provides answers to the patient's questions. So simple!   Kessler is ranked 4th in the nations for rehabilitation.

48. This incident in this civil action is not the only time my preferred method of communication was denied by corporate defendant 2, RWJBarnabas Health.  Subsequently, at a different facility of RWJBarnabas Health in New Jersey in 2020 and 2021 denied my repeated requests of my preferred method of communication of  effective communication that was appropriate for me in the situation at this other RWJBarnabas. Staff that was not a medical doctor repeatedly denied my request at this other facility; I had to send a fax to the doctor explaining the legalities of my request and how it my legally affect him. This medical Doctor, doctor C, was a hospital X was a gentleman about my request because he understood my fax to him.

49. This civil action against the DEFENDANTS is important to the public, especially in New Jersey, because RWJBarnabas Health claims, on their website, to be "The Largest Academic Healthcare System in New Jersey- RWJBarnabas Health (https://www.rwjbh.org/why-rwjbarnabas-health-/ Why Choose RWJBarnabas Health | New Jersey Health System (rwjbh.org))

50. Without correction to wrong doings of violations of civil rights for effective communication of disabled individuals with a traumatic brain injury by RWJBarnabas Health, this and similar violations of effective communication under the ADA, as amended, and the Rehabilitation Act of 1973, as amended, many individuals in the healthcare field will be wrongly taught about this important civil rights matter by RWJBarnabas Health.  This individual include, but are not limited to, new healthcare students, their healthcare providers, and their staff.  A continuation of teachings of such wrong doings about civil rights of the disabled individuals with traumatic brain injuries would have a great negative effect on many individuals medically treated by RWJBarnabas and who are trained and work for RWJBarnabas Health in the healthcare industry for years, if not decade, to come, not to mention the negative effects on the medically injured seek RWJBarnabas Health and the DEFENDANTS for their public services.

5. Statement of Claim: Fraudulent Representation of Medical Records

51. The Claim is directed to all the Defendants.

52. On May 19, 2021, the Plaintiff went to St. Barnabas Hospital in Livingston, NJ to obtain any medical records  so the Plaintiff could determine the name of Defendant 4 (Dr. Lauren J. Curato).  For quite some time, the TBI-disabled Plaintiff could not make the proper connection as to how to obtain the name of Defendant 4.  Once the Plaintiff made the proper

connection as to how to determine the name of Defendant4, the Plaintiff addressed the issue by going to the medical records department at said hospital.

53. (The forced-upon discharge summary that the Plaintiff was told that he had to sign to leave the hospital did not contain the name of Defendant 4.  Oddly, only the name of Defendant 3 was on said summary.)

54. Subsequently, The Plaintiff made the proper request through the proper channels with help from several members of the hospital staff on May 18, 2021.

55. After receiving  what medical records that the medical records department was allowed to provide the Plaintiff, the Plaintiff could not determine who the attending physician was (Defendant 4).  Next, the Plaintiff asked floor staff to direct the Plaintiff to the Emergency Room areas where Plaintiff might be able to determine the name of Defendant.

56. A managing staff member of the Emergency Room examined the medical records on hand of the Plaintiff (just received medical records).  The managing staff member pointed out to the Plaintiff where and how the name of Defendant 4 is listed it the notes that the Plaintiff had on hand.  The name listed was Curato.

57. When the Plaintiff returned home, he searched the internet for the full name of Defendant 4; Defendants full name was found to be Dr. Lauren J. Curato.

58. Sometime soon thereafter, a couple of days or more, the Plaintiff read the notes, and the Plaintiff found that no records of the Plaintiff's requests for his preferred effective communication method nor the denial of the Plaintiff's said repeated request were found in any of the notes by the Defendant.  Also not found were notes about the armed guard, the Plaintiff's emotional dysregulation (crying), the armed guard's assessment of the Plaintiff, the

Plaintiff's repeated requests for imaging of the Plaintiff mid-back (thoracic section of back) pain and hurt that was the main issue of his back, the Defendants' repeated denials of the Plaintiff's imaging requests of his thoracic section where the most pain and stiffness was occurring.

59. The Defendants actions were deliberate acts to protect themselves against having any evidence of the Defendants' disability discrimination.

60. The Plaintiff could reasonably expect the Defendants would keep accurate medical records of pertinent diagnosis, the patient's response to services, and events to the care of the Plaintiff as described in the matters of law pertaining to 42 CFR 482.24 and the cited subsections above.

61. The Defendants actions harmed the Plaintiff by the Defendants gaslighting and not recording material facts to the Plaintiff's claim of disability discrimination.  The Defendants actions cause pain and suffering to the Plaintiff.

62. The Defendants had a duty to accurately record written records pertinent to the Plaintiff's visit.  The Defendants fraudulent represented the Plaintiff's medical records.  The fraudulent representation did not accurately describe the patient's (the Plaintiff's) progress and response to services provided.  Furthermore, the Defendants purposely, intentionally, and knowingly omitted such information to protect themselves from any possible legal action by the Plaintiff: Thereby the Defendants intentionally, knowingly, and willfully chose to commit fraudulent representation of the Plaintiff's medical records; The Defendants' action were directly intended to harm and cause suffering to the TBI-disabled Plaintiff.

63. The Defendants' fraudulent actions are evil and criminal.

64. ~~The Plaintiff's had a need for reasonable reliance upon true and accurate medical records, but the  Defendants' fraudulent actions prevented this reliance (Plaintiff and Federal Government expect that the Defendants follow the matters of law).  The Defendants intentionally failed to follow the laws and regulation of the Federal Government for medical record keeping.  The result of the Defendants fraudulent action  is a substantial factor in causing harm to the TBI-disabled Plaintiff.~~

~~6.  Relief Sought~~

~~65. The TBI-disable Plaintiff seeks more than one type of relief.~~

~~66. The TBI-disable Plaintiff seek compensatory damages for the injury and harm to him from the statute violations where the Plaintiff was discriminated against on the basis of his disability and where the Plaintiff was not provided his preferred method of effective communication for his disability and for the situation by the DEFENDANTS. The compensatory damages amount to $1,000,000.00 (one million dollars) for pain, suffering and mental anguish. Also, such compensatory damage for injury and harm to the Plaintiff from the Defendants' Fraudulent Representation in the Plaintiff's medical records.~~

~~67. The Plaintiff seeks unknown monetary damages at this time for his legal fees and expenses related to this civil complaint; The monetary damage sought would be equivalent to the total hourly rate of the attorneys that may be hired by the DEFENDANTS for this civil complaint as well as similar expense rates by such hires.~~

~~68. The Plaintiff seeks punitive damage from the DEFENDANTS in the amount of $24,000,000.00 (twenty-four million dollars) for violations of his civil rights related to the statute violations under Title II and III of the Americans with Disabilities Act, as amended, under~~

the Rehabilitation Act of 1973, as amended, for discrimination based upon his disability, and for denying the Plaintiff his preferred method of effective communication as per the laws and regulations of the United States of America, and for Fraudulent Representation of the Plaintiff's medical records.

69. Furthermore, the Plaintiff seeks injunction relief for a minimum of ten years with ongoing oversight for developing and employing policies and effective training methods by the DEFENDANTS for medical, administrative, and other staff regarding effective communication for disabled individuals who have traumatic brain injuries and the associated afflictions with traumatic brain injuries. The injunction relief that is requested by the TBI disabled Plaintiff is to have effective policies and information describing the effects on individuals who have various types of traumatic brain injuries and associated afflictions of related deficiencies including, but not limited to, deficiencies to expression, communication, executive functions, sound, light, rate of speech, language usage, physical limitation, information content, etc.

70. The plaintiff humbly requests this relief from the Court, or any other relief that the Court deems appropriate for this complaint.

I declare under the penalty of perjury that Plaintiff believes that the foregoing is true and correct.

Signed this 15th day of July 2021.

—————————— Signature of Plaintiff and Pro Se ——————————————————

Mailing Address: Robert C. Dalton
—————— 24 Maryland Rd.
—————— Little Egg Harbor Twp, NJ 08087
—————— Telephone: 609-879-1797
—————— Email: rca.dalton@gmail.com

107. The Plaintiff seeks remedies in law and equity with unspecified damages over $20,000,000.00 plus punitive damages in excess $100 million, legal fees and other damages. The plaintiff humbly requests this relief from the Court, or any other relief that the Court deems appropriate for this complaint.

I declare under the penalty of perjury that Plaintiff believes that the foregoing is true and correct.

Signed this 3rd Day of January 2024

Signature of Plaintiff and Pro Se

Mailing Address:    Robert C. Dalton
99 Kennedy Blvd, Apt 1.
Bayonne, NJ 07002
Telephone: 609-879-1050
Email:  rca.dalton@gmail.com

EXHIBIT 300

 Gmail

**Robert Carl Dalton <rca.dalton@gmail.com>**

---

## Medication Precert
1 message

---

**Tallulah Moreirafranov** <franovgt@rwjms.rutgers.edu>                    Thu, May 13, 2021 at 11:02 AM
To: "rca.dalton@gmail.com" <rca.dalton@gmail.com>

Good Morning Mr. Dalton,

Diesha forwarded your voicemail to me regarding the medication prior authorization. I see it is still in review with your insurance company. I will notify you when it has been approved. Sunshine is correct in stating that she is unable to email you since it would be coming from her own university email address. I will contact the practice manager to address the concern of this being the only effective form of communication due to a disability. I will have her contact you regarding this matter.

Best Regards,

*Tuti Franov, RN*
*Assistant Nurse Manager- DOM*